236 So.2d 616 (1970)
Emile WEBER, Individually, etc.
v.
The FIDELITY AND CASUALTY COMPANY OF NEW YORK et al.
No. 8002.
Court of Appeal of Louisiana, First Circuit.
May 25, 1970.
Rehearing Denied June 30, 1970.
Henry D. Salassi, Jr., of Breazeale, Sachse & Wilson, Baton Rouge, for appellant.
John T. Caskey, Jr., Asst. Dist. Atty., Baton Rouge, for appellees.
*617 Before LANDRY, SARTAIN and ELLIS, JJ.
LANDRY, Judge.
Defendant William Cooper and Nephews, Incorporated, manufacturer of an arsenical product known as "Cooper's Cattle Dip", and its insurer, Fidelity and Casualty Insurance Company of New York, appeal from the judgment of the trial court awarding plaintiff Emile Weber damages for the loss of cattle and personal injuries to plaintiff's minor sons, Steve and Karl, allegedly resulting from the defective manufacture of the above named product. Kalmbach-Burkett Company, Inc., local distributor of the cattle dip, was also made defendant. An amendment to the original petition asserts the majority of both of plaintiff's sons. The trial court rejected plaintiffs' demands against Kalmbach-Burkett and plaintiffs have not appealed therefrom. We reverse the judgment rendered below and dismiss plaintiffs' demands.
It is undisputed that seven head of cattle belonging to plaintiff Emile Weber died on August 31-September 1, 1963, of arsenic poisoning after having been sprayed with a solution containing defendant's cattle dip. It likewise appears Steve and Karl Weber became dizzy, nauseous and felt faint as a result of being exposed to the solution while spraying animals composing a small herd of cattle being raised by Steve as a 4-H Club project.
The trial court found as a fact that the cattle dip, an admittedly dangerous product, was the cause of the animals' death and the illness experienced by the Weber youths. He also found that the product was properly labeled and gave sufficient warning of its dangerous propensities. The trial court likewise found that plaintiff Steve Weber, who mixed the solution and sprayed the animals, substantially complied with the label instructions governing the preparation and application of the dip. Although the lower court recognized the possibility that other factors could have caused or contributed to the loss and injury, he concluded circumstantial evidence offered by plaintiffs warranted the finding that the dip was negligently manufactured.
The record discloses that Steve Weber was approximately 17 years of age at the time of the incident in question. For some four or five years he had been engaged in raising cattle as part of a 4-H Club project. His endeavors had produced a herd of approximately 12 cattle, some of which had won honors in stock shows. On the afternoon of August 31, 1963, he decided to spray his cattle to rid them of flies, known as cattle grubs, which lay eggs on cattle. The eggs apparently produce worms which enter the bodies of cattle causing large holes to appear in the animal's back.
To accommodate his son Steve, the senior Weber maintained a charge account with Kalmback-Burkett, a distributor of livestock feed and supplies. It appears that Steve had virtually unlimited authority to purchase from this source such feed and supplies as his cattle project required. Approximately four to five months prior to the incident in question, young Weber placed a telephone order with the distributor for a cattle spray in anticipation of spraying his herd on some future occasion. He did not, however, specify either the type of spray desired or the number of cattle to be sprayed. The employees of the distributor filled the Order by depositing a five gallon can of Cooper's Cattle Dip on its loading dock where it was picked up by young Weber after the distributor had closed for the day. The container of dip was brought to the plaintiffs' ranch home and stored in a barn or similar facility somewhat removed from the family residence.
The evidence discloses beyond doubt that the afternoon on which the spraying occurred was an extremely hot day. Steve Weber, assisted by his younger brother, Karl, on foot rounded up the cattle from a pasture measuring approximately 10 acres *618 in area. The animals were thusly herded into a pen near a shed or barn. They were then led singly by a rope halter from the pen to a shed where they were tied to a post and sprayed one at a time. After spraying, they were let out to pasture. Each animal was sprayed over its entire body, including its head. After the seventh or eighth animal was treated, signs of distress began to appear in that the sprayed animals staggered, fell and went into convulsions. The spraying operation was ceased immediately. The Senior Weber was summoned and in turn he enlisted the aid of a veterinarian. When the boys complained of dizziness, nausea and feeling faint, Mr. Weber immediately took them to a physician. The veterinarian worked the remainder of the afternoon and through the night attempting, without success, to save the animals that had been sprayed.
The container of Cooper's Cattle Dip displayed a large yellow label measuring approximately 14 by 7 inches. Detailed instructions for its use were printed in black thereon as follows:

"Directions for Use
For all Official Dippings in interstate movement of liverstock, add one gallon of Dip to every 127 gallons of water. For ranch use and other than official dipping, a dilution of one gallon of Cooper's Cattle Dip to 155 gallons of water will be found very effective. Always pour dip straight into the water and mix thoroughly with a plunger. There should be no previous mixing.
The stirring should be very thoroughly donethis is importantCooper's Cattle Dip dissolves readily but to be sure it is thoroughly mixed, proper attention must be given to this first stirring. No intermediate stirring is necessary, as no sediment forms in the mixed wash. Wash out cans to ensure the entire contents being used. In mixing the solution don't guess at the quantities of either water or Dip.
It is important that the Dip and water be accurately measured and the proper strength always maintained. This can be done with a Cooper's Cattle Dip Testing Outfit.
If mixed dip has stood several months, it should not be usedclean out dipping vat and start with fresh dip. Old mixed dip oxidizes in the vat and is stronger than the Testing Outfit indicates. This may cause burning.
Cooper's Cattle Dip is effective when applied as a sprayhowever, spraying should always be carefully donenever spray cattle bunched in a pentreat each animal individually in a chute.
Never rub dip on to skinthis is dangerous.
It is very necessary to rest and water cattle before dipping or spraying. Cattle should be rested in a shady place following dipping or spraying and never driven immediately after treatment. Cooper's Cattle Dip is a very reliable product and will give excellent results, but if cattle are heated or tired there is liability of burning. Dip or spray early in the day to assure cattle drying thoroughly before nightfallthis is especially important on cloudy or muggy days. Carelessness in this respect may result in serious loss.
Repeated Dipping or SprayingIf a second dipping or spraying is carried on in the interstate movement of live stock, an interval of not less than seven days after the first should be allowed."
At the bottom of the label appeared a red skull and crossbones on either side of which were the words "Caution Poison." Below this warning, the following admonition appeared in red:
"Cooper's Cattle Dip is a poisonous preparation and must be used in accordance with directions. Never increase the strength. Cooper's Cattle Dip will fulfill claims made for it at the strength designated.

*619 * * * * * *
CAUTION-Keep away from children, pets and food stuffs. Avoid excessive skin contact and wash off thoroughly after exposure. If on clothing remove and wash. Avoid inhalation and spray mist. Skin absorption or swallowing may be fatal to livestock. Rinse empty containers several times with water. Perforate or break, and bury containers, never re-use."
Steve Weber testified in essence that he read carefully the printed instructions on the can of dip after which he prepared the solution by adding one ordinary household cup of the dip to a 20 gallon garbage can which he had previously filled with water. Then with the aid of a stick he stirred the mixture vigorously in one direction and then reversed direction and stirred to be sure the dip and water were thoroughly mixed. Using a gasoline powered pesticide sprayer, he thoroughly sprayed each animal all over. He explained that the sprayer was equipped with one hose that was inserted into the solution of spray and a second hose containing a nozzle by which the spray could be adjusted. He also stated that both the garbage can and sprayer were clean before the operation commenced. In a pre-trial deposition, he stated that he poured the cup of dip into the garbage can and then filled the container with water. The only knowledge he had of the technique of dipping or spraying cattle was obtained from 4-H Club lectures and his own occasional reading of pamphlets on the subject. He conceded his past experience in spraying cattle consisted solely of his using a hand sprayer to spray his show animals on a few occasions. In these instances, he used a brand name product which we understand to be an all purpose cattle spray. He had never previously used either Cooper's Cattle Dip or a power sprayer to treat a relatively large number of livestock at one time. On the occasion in question, he never sought nor obtained any information regarding the use of Cooper's Cattle Dip or the employment of a power sprayer in its application to cattle.
Mr. Weber's testimony is substantially that when summoned to the scene, he found the cattle staggering or lying down in convulsions. He examined the can containing the concentrated dip and observed that so little was missing, it was difficult to tell whether any had been used. He also examined the garbage can in which the solution was mixed and found only two or three inches of mixture left in the bottom of the can. He summoned a veterinarian to attend to the animals. When his sons complained of headaches and nausea, he immediately sought medical advice. Fearful of the arsenic in the compound, a day or two following the incident, he caused the remainder of the cattle dip, the garbage pail, the cup used for measuring, the stick with which the mixture was stirred and the carcasses of the animals to be buried. A freeway, having since been erected over the site, neither the dip nor the carcasses of the animals were available for further examination.
Dr. M. C. Helouin, veterinarian, was summoned to the Weber home approximately one and one-half hours after the spraying. On arrival, he found the cattle in convulsions. He was certain they died of arsenic poisoning. His night long ministrations proved futile as all affected cattle died. He stated that although Cooper's Cattle Dip was widely used, he never personally used the product because it was dangerous. He always used and prescribed other products he considered safer. He conceded he did not check the spraying equipment to determine whether it had any connection with death of the cattle.
Dr. Paul Christofferson, Veterinary Director of the dip manufacturer, testified he is in charge of research, development and quality control of the product. He explained that the basic market for the dip is the Federal government and state governments. Batches of the dip are made only upon order from the Federal government. He explained that each batch is tested and also subject to analysis by representatives of the government. After the government *620 order is filled, the remainder is sold to states or placed on the market. He noted that it was customary to keep company records for three years and that no records were available regarding tests run on batches of dip made in 1963. He also noted that one cup of dip to 19 or 20 gallons of water would constitute a ratio of 1 part dip to 200 or 230 parts of water which would produce a solution so weak, it probably would not kill cattle ticks. Dr. Christofferson also explained that adding the dip to the water is vital because if water is added to the dip, the dip will remain at the bottom of the container in concentrated form. He likewise observed it is important that the cattle be well rested and watered before dipping or spraying. He explained that if the cattle are thirsty, they are apt to drink the dip or spray. If hot they absorb more of the arsenic through the skin.
Dr. C. M. Heflin, veterinarian, testified he had used the Cooper Dip for approximately 40 years without adverse results. In his opinion, a cup, consisting of six to eight ounces of the concentrate, in 19 or 20 gallons of water would not kill cattle. It was his further opinion that it would take approximately ten times the ordinary concentration of dip to prove fatal to cattle within an hour or so after application.
Plaintiffs, relying upon Arnold v. United States Rubber Company, La.App., 203 So.2d 764, maintain defendant's liability is predicated on the rule that the manufacturer of a product dangerous to a user is liable to anyone who, without fault on his part, sustains injury because of a defect in design or manufacture of the product. This is unquestionably the law of this state. See also, Meche v. Farmers Drier & Storage Company, La.App., 193 So.2d 807. In cases involving the sale of adulterated or impure food designed for human consumption, absolute liability is imposed upon the manufacturer or vendor. McCauley v. Manda Brothers Provisions Company, La.App., 202 So.2d 492. In instances not involving the sale of food for human consumption, the liability of the manufacturer is not absolute. In such cases, the plaintiff alleging manufacture or sale of a dangerous product bears the burden of proving the alleged defectiveness thereof. Arnold v. United States Rubber Company, above; Evans v. Travelers Insurance Company, La.App., 212 So.2d 506, and cases cited therein.
In the case at hand plaintiffs have offered no evidence whatsoever tending to establish the dip in question was negligently manufactured. That its use killed the cattle and caused plaintiffs to become ill does not per se, under the circumstances of this case, prove the product was improperly manufactured.
The expert evidence discloses beyond doubt that even when properly manufactured, the product is extremely dangerous to both humans and animals. It also appears the propensities of the product are such that one expert witness declined to use it because of the danger involved. Another expert suggests that use of the product according to directions of the manufacturer renders it relatively safe to handle. This conclusion appears substantiated by the record which establishes that the product has in fact been in general use for many years. A reasonable assumption from the evidence is that it is a product which should be used with utmost caution and not by persons inexperienced in its use and unaware of its properties. The very nature of the product requires that the manufacturer fully and completely inform and alert users to the necessity of strict compliance with directions for its safe usage. We find that the manufacturer has discharged this burden in this instance. The label on defendant's container expressly cautions the prospective user as to the dangerous qualities of the content; it prescribed a certain ratio of concentrate to water and warns the user not to guess at or estimate either the amount of water or dip. Express instructions are given as to the method of stirring. In addition, the instructions *621 expressly admonish that cattle be not dipped or sprayed unless rested and watered and afterward rested in a shady place. It warns of the probability of burning if cattle are dipped or sprayed with the solution and for that reason recommends that cattle be sprayed or dipped early in the day to assure thorough drying before nightfall. These latter admonitions are immediately followed by the statement that carelessness in their observation may lead to serious loss.
We disagree with the finding of the trial court that young Weber substantially complied with the manufacturer's instructions for the safe use of the product. The evidence establishes beyond doubt that the day in question was extremely hot. While the cattle were not driven in the sense they were herded a long distance, it is shown that they were brought in from a ten acre pasture where they were grazing. They were driven to a pen and the spraying began immediately. It does not appear that they were watered prior to the spraying operation. The spraying was commenced on a hot afternoon despite directions to the contrary. The ratio of concentrate to dip was not measured precisely as the directions suggested. There appears some doubt as to whether the dip was added to the water or vice versa.
Since the record establishes that the animals died of arsenic poisoning and plaintiff has offered no proof whatsoever that defendant's product was defective, only two conclusions appear plausible. Either Steve Weber mixed the concentrate stronger than he recalled or his carelessness in not following defendant's express instructions resulted in the "serious loss" of which defendant's label expressly warned. Because the cattle became distressed within such a short time following their spraying, we are inclined to the view that notwithstanding young Weber's testimony to the contrary, he probably either put too much dip in the quantity of water used or did not properly mix and stir the solution. Whatever may have been the cause of the loss, plaintiff has failed to establish negligence on defendant's part.
The judgment of the trial court is reversed, costs to be paid by plaintiffs.
Reversed and rendered.