SAMUEL, Judge.
Plaintiff filed this suit against various defendants seeking damages for personal injuries sustained by him when a Bell helicopter owned by his employer crashed. The present appellant answered, denying liability and pleading contributory negligence.
After a trial on the merits, judgment was rendered in favor of plaintiff and against only one of the original defendants, Bell Helicopter Company, in the amount of $147,500. Bell has appealed from that judgment. The issues presented on appeal are liability, including contributory negligence, and alternatively, quantum.
On November 7, 1973, while working for Chem-Air, an agricultural spraying organization, plaintiff flew a Model 47G-5A Bell helicopter to Callender Field in Belle Chasse. On arrival at Callender he began spraying grassy areas of the airfield. The *731 helicopter had been performing properly prior to November 8,1973 but on that date, while plaintiff was hovering 5 to 10 feet above the ground and moving slowly down the runway, it began to spin. The centrifugal force of the spinning caused plaintiff to lose control, the helicopter went straight up into the air while spinning and, although plaintiff manipulated the controls in an effort to bring it safely back to a landing, it crashed to the ground and bounced before coming to a stop. Plaintiff was pinned in the wreckage, which began to burn, and was unable to extricate himself. In the meantime, his superior, Max Edwards, was screaming at him to get out of the helicopter because of the fire. Plaintiff eventually managed to free himself, crawled out of the wreckage and was able to get a short distance away. A fire crash truck arrived, and a fireman jumped off the truck and covered plaintiff’s body with his own because of an expected explosion. Plaintiff apparently fainted and woke up ten hours later in a motel room.
Plaintiff blames the crash on the failure of the helicopter’s tail rotor system. As explained in the record, a helicopter possesses a propeller on its tail, known as a tail rotor blade, the function of which is to keep the aircraft from spinning in the direction opposite from the torque created by its main engine. The helicopter in suit had been certified originally on April 20, 1972 and again on August 13, 1973 as airworthy by the FAA. At the time of the crash it had 537.6 hours of engine time, which did not require or justify the 600 hour inspection recommended by defendant’s maintenance manual.
The voluminous record is replete with contradicting statements by the parties involved, and this is especially true of the testimony of the expert witnesses presented by them. In addition, the testimony and briefs are replete with contradictions and accusations, plaintiff attempting to discredit appellant’s experts because they were its employees, and defendant attempting to discredit plaintiff because of alleged defects in his character and personality. We confine ourselves to a determination of the central issues presented on liability. Those issues are whether the crash of the helicopter was caused by a failure of the tail rotor system and, if so, whether the trial court was justified in concluding that failure was caused by a defect in the manufacturing process.
The record reveals Chem-Air had purchased the helicopter in suit on August 6, 1973. At the time of purchase it had logged only 237 hours on its engine and airframe. The craft was rigged with a spraying apparatus by Campbell Air Service and was given a certificate of airworthiness by the FAA on August 13, 1973. Plaintiff is not a licensed aviation mechanic, although he is regarded as a highly experienced helicopter pilot. He enlisted in the Marine Corps on November 1, 1945. After his discharge he was reinducted in January of 1953 and assigned to the Army Aviation School at Fort Sill, Oklahoma. His formal training in helicopter flying began at that time, together with training in helicopter maintenance. This training included “fuel maintenance procedures” which were rather extensive in nature. Plaintiff then was assigned to a helicopter company at Fort Raleigh, Kansas as a crew chief, in which function he maintained army helicopters. He worked on Sikorsky H-19’s, Bell H-13’s, and other types. In 1954 he was transferred to Fort Eustace, and was sent to the aircraft maintenance officers school for the purpose of becoming a maintenance officer to supervise mechanics working on aircrafts and helicopters.
In 1957 plaintiff returned to commercial aviation, flying helicopters for Petroleum Helicopters in the oil industry. He flew Bell Model 47’s, which he also later flew while spraying banana trees in Central America. In 1960 he returned to the United States and worked for Rotor Aids at Grand Isle, Louisiana, transporting personnel to oil rigs in the Gulf of Mexico. In January, 1964, he was recalled to active military service, flying helicopters in Vietnam. He was shot down four times, and received two Purple Hearts. On three of these four occasions he was able to repair *732 the helicopter himself and fly it from its crash site.
Upon discharge in January, 1967, plaintiff returned to his former employer, Rotor Aids. He flew Bell Model 47’s, Sikorsky S-55’s, Sikorsky S-62’s, and French built Allouette helicopters, in which he transported men and equipment to offshore platforms. In 1972 he left Rotor Aids to work for Chem-Weed. This company dissolved, but two partners engaged him to work for their new company, Chem-Air, flying Bell Model 47G-5A helicopters to spray chemicals.
While employed with Chem-Air, plaintiff was rated as a commercial pilot for single engine airplanes and helicopters. As stated above, he was not a licensed mechanic, but he was required, in the course of his duties, to perform inspections, maintenance, and some repair work which included changing the oil when scheduled, removing oil filter screens, inspecting, replacing and lubricating bearings, and otherwise handling oil changes on a day-by-day basis in accordance with manufacturers’ manuals. He testified this type work was in line with his former military duties and schooling as a maintenance supervisor.
Thus, there is sufficient evidence in the record for the trial judge to conclude that plaintiff was a well experienced helicopter pilot and possessed substantial schooling and experience as a helicopter mechanic.
The events leading to the crash are related in the record as follows: At Magnolia, Arkansas, plaintiff began to hear a sound or pitch of tone not common to a Bell Model 47G-5A helicopter. He related this to his superior, Edwards, and to S. B. Brown, a helper and truck driver for Chem-Air. Plaintiff did a visual inspection of the helicopter but could find nothing wrong. He instructed Brown to lubricate the helicopter, and he later flew Edwards to Vivian, Louisiana, where Campbell Air Service is located. The owner, Buster Campbell, was told about the suspected trouble and was requested to check it out. Campbell performed a complete exterior visual examination, but could only hear or feel a possible “high frequency” vibration which resulted from excessive lubrication in a grease boat along the tail rotor shaft. Campbell squeezed the excess out of the grease boat, and eliminated the high frequency vibration. Plaintiff insists Campbell stated he could not hear the unusual noise of which plaintiff complained. Campbell stated the helicopter was in satisfactory condition and suitable to go on the job scheduled in Belle Chasse. It should be noted Campbell Air Service is a Bell helicopter authorized repair station.
That same day, plaintiff flew back to Chem-Air’s business location in Shreveport where he instructed Brown to remove the oil drain plug. Shortly thereafter plaintiff himself returned to the helicopter and removed and inspected the oil filter screen. He explained he did this, as one would do on an automobile, to see if any metal particles in the oil filter screen indicated trouble inside the engine or transmission. He was unable to detect any metal particles.
Because of darkness, plaintiff left the helicopter parked overnight, and the next morning he replaced the oil. At this time, the helicopter had logged only 521.3 engine hours. On November 4, plaintiff changed the oil in the tail rotor gear box, located at the end of the helicopter tail. The aircraft left Shreveport on November 5, and made its way to Callender Field. At the time of the crash on November 8, its engine clock showed 537.6 hours.
Hershel Abe, an FAA inspector, inspected the aircraft after the crash. His report states the accessory drive gear in the transmission showed limited damages, and that metal particles were observed in the inner surface of the transmission case. Abe concluded that metal particles in the oil system could have been detected prior to complete failure. However, as plaintiff points out, Abe found no metal particles anywhere in the oil filtering system which would have shown on the oil screen which plaintiff observed. Plaintiff argues from this fact that Abé’s statement in no way supports the inference the failure was a gradual one rather than an instantaneous occurrence *733 leaving no time for the particles to be filtered out. Plaintiff also relies strongly on the fact that none of the inspections performed to the date of the crash required either a pilot or licensed mechanic to open the transmission for inspection. The part which failed, causing the crash, was the tail rotor drive gear. This part is located inside the transmission and ordinarily is not visible except on a 600 hour inspection during which the transmission is opened. The time for the 600 hour inspection had not arrived when the helicopter crashed.
With regard to the testifying experts, plaintiff offered the testimony of an aeronautical engineer who basically confirmed plaintiff’s contention that the crash was caused by the failure of the tail rotor drive gear. This expert further emphasized the point that the FAA accident report did not indicate metal particles existed in the oil filter system, but were only found in the bottom of the transmission oil pan.
Bell introduced the testimony of Thomas Fleming, manager of Product Support Engineering, employed by Bell itself. Fleming had no formal mechanical or engineering training except on-the-job training at Bell. He admitted he had not worked on a Bell 47 for five years. Fleming emphasized the importance of maintaining a Bell log book, and insisted a licensed mechanic was necessary to do a proper inspection. Nevertheless, he admitted at such an inspection (other than the 600 hour inspection) there would be no need to disengage a coupling near the part in question, and that no wear would have shown without such disengagement.
Another expert offered by Bell was Clayton Darrow, who was a mathematics major in college and had received training in metallurgy and accident investigation while working for Bell. Darrow is not a graduate metallurgist nor is he a licensed engineer. His testimony offered little help, his primary theory being that a bearing in the tail assembly developed what he called “spoils” because of contaminated oil. The trial judge properly did not allow him to testify as a chemist in spite of defendant’s attempts to question him on matters in that field.
On cross examination, Darrow admitted a breakdown of oil could result in excessive heat, and he could not explain the absence of metal in the oil filters in the FAA report except for those at the bottom of the transmission.
Appellant also offered the testimony of Frank Zirblis, a Bell employee for 25 years. Zirblis had the title of Product Support Engineer. He testified he was very familiar with Model 47G-5A helicopters, and that he had much military training in flying and maintenance. He admitted he had no engineering degree, no knowledge in design, and no expert knowledge of chemistry. Nevertheless, Zirblis attempted to show improper inspections by plaintiff. Like the other employees called by Bell, he testified metal particles should have been noticed in the oil screen prior to the failure in question. He insisted on cross examination that the tail rotor gear failure was a progressive failure rather than instantaneous, but he also admitted he had never before seen a tail rotor gear failure.
As part of the testimony of Zirblis, it became clear the helicopter in suit was manufactured by Bell and certified on April 20,1972, approximately four years after the introduction by Bell of a newly designed sleeve to improve lubrication and cooling for the assembly. Zirblis also contradicted the testimony of Fleming to some degree by stating the engine heat gauge and the transmission heat gauge were controlled by the same switch, and both could not operate simultaneously. He testified separate switches would cost more money to install, implying the lack of dual switches was an economic factor in attempting to keep manufacturing costs down.
Finally, Bell called Walter Moore, who represented the manufacturer of the quill assembly in the tail rotor gear. He was director of qualify control for that company and a licensed engineer. Moore testified the transmission in suit originally had been shipped to Bell on March 17, 1969, was overhauled by his company on August 12, *734 1971, and returned to Bell for installation. Moore insisted the part manufactured by his company was perfect, but he omitted to bring the complete record pertaining to the concentricity of the drive gear and its shaft.
In a “products liability” case, plaintiff has the burden of proving the existence of a reasonably dangerous manufacturing defect and that the defect caused the accident.[1] In cases where a new or relatively new item or machine sustains an accident, the court may use circumstantial evidence tending to prove the defect had existed when the item left the factory if the defect manifested itself soon after the manufacturing process.[2]
Thus, the trial judge was faced with a question of fact, whether the failure of the tail rotor drive gear was of such a nature as to be imputed to a manufacturing defect. He obviously concluded it was, and consequently held the appellant manufacturer in damages. As the record contains sufficient substantial evidence supporting that conclusion, we cannot say the trial judge abused his discretion in so holding. Relative to appellant’s contention regarding contributory negligence, as we have said in part, the record contains ample substantial evidence showing that, contrary to appellant’s contention, plaintiff did provide proper or adequate maintenance for the helicopter, was qualified to so provide, and was not negligent. Accordingly, we affirm on the issue of liability.
Finally, we address ourselves to appellant’s contention that the trial court’s award for plaintiff’s injuries is excessive. The award is for itemized knee, shoulder and back injuries, atrophy of muscle and traumatic neurosis in the total amount of $147,500.
Regarding those injuries, lay testimony was given by plaintiff and other witnesses and medical testimony was given (by deposition) by four doctors. The medical evidence was as follows:
Dr. King, an orthopedic surgeon, first saw plaintiff on November 20, 1973. At that time plaintiff complained of pain in the neck on raising his right shoulder, and in his left knee. X-rays revealed no fractures of any area other than an undisplaced fracture in the region of the anterior tibial spine. Dr. King had seen plaintiff after a prior helicopter accident when plaintiff had a blow to the front and back of his shoulder. However, in the instant case, he was struck from a different angle, this time on the top side of the joint.
The doctor concluded plaintiff had injured the anterior cruciate ligament with undisplaced fracture at the spine. A knee support was recommended for several weeks to keep the leg immobilized, and an injection was given in the right shoulder for a possible bruised supraspinous tendon. Pain pills were prescribed.
Plaintiff returned on January 21, 1974. He still had difficulty with his right shoulder, and atrophy of the deltoid muscle was noted. X-rays were repeated and a slight subluxation (partial dislocation) of the acromic clavicular joint and degenerative changes in this area also were noted. Plaintiff did not return after the January, 1974 visit. The only time plaintiff complained of his knee to this doctor was on his first visit in November, 1973.
On October 8, 1974, plaintiff visited Dr. Edmond C. Campbell, also an orthopedic surgeon. He complained of pain in the right shoulder, upper and lower lumbar and sacroiliac region and left knee. X-rays revealed a rotary instability. The range of motion was normal. The only evidence of abnormality were two loose bone fragments in the knee joint immediately adjacent to the posterior tibial condyle. The larger of the fragments measured 8 X 10 millimeters in size. The doctor concluded there was damage to the anterior capsule of the knee and some degree of injury to the anterior cruciate ligament. This condition is disabling for athletic endeavor or strenuous working activities.
*735 Dr. Campbell estimated plaintiff’s impairment at 20% of the lower left extremity because of instability of the knee. A decision as to whether the plaintiff was fit for the occupation of airline pilot was beyond the scope of this physician’s expertise. Plaintiff was next evaluated on August 4, 1975. The instability of the knee was still noted and plaintiff was advised to continue exercises. On September 24, 1976 plaintiff still complained of instability of his knee, and a football knee cage brace was recommended. On January 20, 1978 (upon an examination performed just before taking the doctor’s deposition), the rotary instability was still present and plaintiff still had a 20% disability of the leg. The doctor expected the disability to be permanent and possibly to increase slightly.
One of plaintiff’s physicians, a Dr. McCutchen, who was not otherwise identified in the record, recommended a psychiatric examination. Plaintiff was reluctant to consult a psychiatrist because he did not consider his problem was psychiatric in nature. However, he did consult Dr. Harper Willis, a psychiatrist, on September 10, 1976. The doctor went into plaintiff’s history extensively, found that he had only an eighth grade education, but had been trained in the army as an airplane pilot, and had travelled all over the world because of his profession. He told the doctor of his two helicopter accidents and his feelings after each. Following intelligence and other tests, the doctor concluded there was no evidence of brain damage, and that although plaintiff’s education was limited, he had superior intelligence. In Dr. Willis’ opinion plaintiff had extensive psychoneurosis of traumatic origin. He had a high area of hysteria which the doctor felt was responsible for converting his difficult symptoms, such as blindness, epileptic spells, and shoulder abnormalities, and he had also developed agoraphobia (fear of open space). He should be on medication to decondition some of the trauma. The doctor recommended treatment for six months to one year at a cost ranging between $700 to $15,000. He felt plaintiff’s prognosis was not good, because plaintiff refused to accept the diagnosis that he was neurotic. The doctor stated unless a patient is willing to undergo treatment, which this plaintiff is not, and responsive to treatment, he may never get well.
Dr. Paul F. Short, a general practitioner authorized to perform examinations in accordance with the Federal Aviation Authority criteria, examined plaintiff for a second-class commercial pilot’s certificate on October 6, 1976. Although the doctor found no physical evidence to support plaintiff’s complaints, he denied plaintiff the certificate because plaintiff admitted having double vision, periodic episodes of blackouts with actual loss of consciousness, and was forced to wear a left knee brace at times for stability. The physical examination was within normal limits with the exception of the lower extremities.
The lay testimony is to the following effect: Plaintiff suffered with pain in the leg, shoulder and back. There are three areas of his spine which hurt following the accident, with that pain continuing until the time of trial, particularly upon sitting. This pain diminishes upon moving around. The shoulder and the shoulder joint are painful in almost any position. At times the arm goes “to sleep” and, as a result, for long periods of time plaintiff has an absence of feeling in the back portion of his right arm and in two of his fingers of his right hand. He has a weakness in the right arm and shoulder which restricts their use.
Plaintiff disclaimed having headaches as such, but stated at times he gets an intense, sharp pain in the right rear of his head, causing him momentarily to lose both his vision and consciousness. At times he wears a brace on his left knee because it buckles under him when climbing steps or otherwise putting some extra weight on the left leg. While a knee operation has been suggested, he feels such surgery at this time would be ill-advised because it would not restore him to flying status. He can no longer fly, especially because of the difficulties with his right arm and shoulder (he is right-handed) and because he cannot sit long enough to be able to work as a pilot. *736 Plaintiff also complains of an inability to focus his eyes on anything close, becoming short tempered for no apparent reason and outraged to the point of violence. Plaintiff’s wife is employed for the first time in order to help support their family.
We are satisfied that if plaintiff was capable of doing so, he would continue his aviation career, in which he was able to obtain work in many parts of the world and maintain his family in a status commensurate with that position, rather than, as he has since the accident, work in the office of an automobile agency or assist his wife in operating a dry cleaning establishment. But because we feel some of plaintiffs complaints are exaggerated, if we were setting the award originally, we would arrive at an amount less than $147,500. However, we are required to follow the guidelines set by the Supreme Court of Louisiana, most recently in Reck v. Stevens,[3] particularly in that before the appellate court can disturb the type of award made by the trial court here, the record must “clearly ” reveal that the trier of fact abused its discretion in making the award. We find no such clear abuse in this case.
For the reasons assigned, the judgment appealed from is affirmed.

AFFIRMED.

. Simon v. Ford Motor Company, La., 282 So.2d 126; Weber v. Fidelity and Casualty Co. of New York, La.App., 236 So.2d 616.

. Landry v. Adam, La.App., 282 So.2d 590.

. 373 So.2d 498, 1979.