403 So.2d 83 (1981)
Robert G. SUHOR, Jr.
v.
Richy J. GUSSE and Donald Bellow, et al.
No. 9520.
Court of Appeal of Louisiana, Fourth Circuit.
July 8, 1981.
Rehearings Denied September 28, 1981.
*84 Occhipinti, Grace, Berger & Dunford, John A. Occhipinti and Christopher T. Grace, Jr., New Orleans, for plaintiff-appellant.
Sessions, Fishman, Rosenson, Snellings & Boisfontaine, Robert E. Barkley, Jr. and *85 Linda S. A. Burke, Porteous, Toledano, Hainkel & Johnson, Ben C. Toledano, Michael K. Fitzpatrick and Margaret A. Bretz, New Orleans, for defendants-appellees.
Before SAMUEL, REDMANN, GULOTTA, BOUTALL and BARRY, JJ.

ON REMAND FROM THE SUPREME COURT
SAMUEL, Judge.
This matter has been remanded to us by the Supreme Court for an independent evaluation of damages.[1]
Plaintiff, Robert G. Suhor, Jr., filed this suit for personal injuries sustained by him in a rear end vehicular collision. Named defendants were Donald Bellow, individually and as administrator of the estate of his then minor daughter, Darlene (driver of the other vehicle involved), Allstate Insurance Company, the Bellows' liability insurer, and State Farm Mutual Automobile Insurance Company, the liability insurer of plaintiff's employer, whose truck plaintiff was driving at the time of the accident. Richy J. Gusse, newlywed husband of Darlene Bellow, also was a named defendant, but he was dismissed on an exception of no cause of action.
All defendants answered in the form of a general denial and pleaded negligence and contributory negligence on the part of plaintiff; State Farm Mutual made a third party demand against the Bellows; and State Farm Fire & Casualty Company, plaintiff's employer's compensation insurer, intervened for workmen's compensation benefits, including medical expenses it had paid plaintiff.
Following trial by jury, judgment was rendered in favor of plaintiff and against Donald Bellow, individually and as administrator of the estate of Darlene M. Bellow,[2] and Allstate Insurance Company, in solido, in the sum of $25,000.[3] All claims against State Farm Mutual were dismissed, as was that litigant's third party demand against the individual defendants. Plaintiff appealed, we affirmed,[4] the Supreme Court granted certiorari, 380 So.2d 69, and remanded to us, as we have said, for an independent evaluation of damages.
The trial judge permitted evidence of the individual defendants' inability to pay, but prevented plaintiff from informing the jury of the limits of various insurance policies, and then instructed the jury it could consider the inability to pay any damages over and above any insurance coverage, without informing the jury of the amounts of insurance available. The Supreme Court found these errors improperly influenced the jury in making its award for damages.
Although it was not introduced, the parties stipulated (outside the presence of the jury) that the Bellows' liability policy issued by Allstate provided coverage of $50,000. The uninsured/underinsured motorist coverage of plaintiff's employer was in the total amount of $700,000 in six separate policies issued by State Farm Mutual. The U/M coverage on the truck plaintiff was driving at the time of the accident was $100,000 per person, $300,000 per accident.
On our original hearing we reviewed the damage award under the "much discretion" standard of Coco v. Winston Industries, Inc., La., 341 So.2d 332, and affirmed. On rehearing before a five judge panel we again affirmed because of the absence of the majority needed to change the trial court judgment.
As stated in our original opinion, plaintiff was injured in a typical rear end vehicular *86 collision and liability is not an issue. At this time the issues are the extent of the injuries and losses sustained by plaintiff, the amount of damages to which he is entitled, application of the inability to pay doctrine, what portions of the award, if any, are due by the Bellows, Allstate (under the liability policy it issued to Bellow), and State Farm Mutual under the U/M provisions in the liability policies it issued to plaintiff's employer, and State Farm Mutual's third party demand against the Bellows.

THE INJURIES AND LOSSES SUSTAINED
The principal medical evidence was given by Dr. Kenneth Adatto, an orthopedic surgeon who was plaintiff's treating physician, Dr. Marvin Miller, a psychiatrist, and Dr. Richard Levy, a neurosurgeon who examined plaintiff on one occasion on behalf of defendants.
The accident occurred on November 3, 1975 and plaintiff was seen by Dr. Adatto on November 11, 1975. Dr. Adatto testified:
The orthopedic examination revealed spasms in the cervical and lumbar zones and plaintiff was placed on tylenol with codine for pain, and muscle relaxants. When seen on November 21, 1975, plaintiff had not improved. Physical therapy was recommended. On December 5, he showed slight improvement but was placed on new medication because of further complaints of pain. On December 19, he was much improved. He was permitted to return to work on January 5, 1976. However, he returned to this doctor on January 9 and 16 because the pain was worse. He was advised to see Dr. Palmer, a neurologist, and to get further bed rest. Examination on February 3 showed plaintiff was still having much difficulty.
Following consultation with Dr. Palmer, a myelogram was recommended and was performed in February, 1976. Defects revealed by the myelogram indicated surgery was advisable, and on March 30, 1976 plaintiff was hospitalized and a laminectomy, a laminotomy and a spinal fusion were performed. Plaintiff was discharged from the hospital on April 15, 1976. He was instructed to wear a metal brace for four to six months to protect his back. He returned to Dr. Adatto innumerable times thereafter and was improved on January 7, 1977, his last visit prior to trial. In Dr. Adatto's firm opinion, as a result of the surgery, plaintiff will not be able to stoop, lift or bend on a competitive basis, nor will he be able to lift anything over 25-50 pounds for the remainder of his life.
Dr. Adatto further stated the purpose of fusing is to make the portion a solid fixed structure. However, x-rays showed the operation had not been successful in that respect; the fusion was not solid. He concluded that as a result of the accident plaintiff had a 25% permanent disability of the body as a whole and, since the fusion is not solid, another operation may be needed.
Dr. Coleman Schneider, a radiologist, confirmed Dr. Adatto's finding that the fusion was not solid.
Because of the physical problems resulting from the accident, plaintiff became despondent and discouraged. He was seen by the psychiatrist, Dr. Marvin Miller, on eight occasions between May 26, 1976 and February 23, 1977. Dr. Miller's diagnosis is that plaintiff experienced a neurotic depressive reaction as a result of the accident, injuries and subsequent medical events, and that he has a serious psychiatric problem. He found plaintiff anxious to return to an active, normal life but extremely worried about his inability to do so because of his unstable back and general physical condition.
Dr. Miller stated plaintiff sustained a loss of comfortable body use which made him unable to get in and out of his automobile. He was unable to continue driving a truck or working at the job he had prior to the accident, a job which held a promising future, and he was unable to participate actively in launching a boat or bringing it back to shore, thus interfering with his hobby of fishing which had given him great pleasure prior to the accident. Also, plaintiff *87 lived with his mother and was unable to care for her as he had done previously. Plaintiff is very discouraged with the limitations placed on his life after the accident, which he felt was no fault of his own. He disliked becoming dependent on people, particularly because he had been an active participant prior to the accident. He formerly had a great deal of self esteem, which has now been shattered, particularly by his inability to work at the same or a similar job because he cannot stoop or lift without possible damage to his back.
Dr. Miller concluded plaintiff wants to work on a fulltime basis and is very desirous of reentering a life situation involving work. Definitely, he is not a malingerer. Before the accident he would have had no need for psychotherapy. At his last visit on February 23, 1977 plaintiff still had intermittent pain and had an eight pound weight loss due to worry about the physical findings of which he recently had been informed, i.e., the fusion was not solid.
Dr. Levy, a neurosurgeon called by the defendants, examined plaintiff on one occasion, January 25, 1977. He was aware of the operation performed by Dr. Adatto. At the conclusion of his neurological examination, Dr. Levy found plaintiff did not have an active or current disability which would prevent him from doing whatever he wanted to do; there was no neurological abnormality. However, he admitted when an individual has a portion of two discs removed, he does have a degree of disability, and estimated plaintiff's disability as 10-15% partially of the body as a whole. This rating did not include disability resulting from the spinal fusion, which was not solid, as disclosed by the x-rays which revealed motion at the L4-L5 and L5-S1 level, and which is an orthopedic problem not in the field of neurosurgery. We are totally unable to understand this doctor's conclusion that plaintiff could do anything he wanted to do.
Susan Smith, an expert in occupational therapy and vocational evaluation, concluded: Plaintiff's physical condition at present limits him to light work, lifting no more than 25-50 pounds (in line with Dr. Adatto's thinking); he cannot sit for long periods, is unable to work a full 8 hour day, and can work no more than 3 hours per day. She stated employers are reluctant to hire people with such back problems.
Lay testimony of plaintiff and his mother was to the effect that prior to the accident he had been very active physically, bowling, fishing, doing yard work at home and doing very well in a job which offered future advancement. He has been unable to return to that job since the accident because it requires heavy lifting. This testimony supports the conclusions reached by Dr. Miller, the psychiatrists, and all of the other medical evidence with the sole exception of a part of Dr. Levy's testimony.
The only evidence regarding loss of wages was given by a plaintiff witness, Dr. Melville Wolfson, an expert in the computation of wage loss and present valuation analysis. Basing his finding on plaintiff's age (25 years at the time of the accident), annual wage at the time of the accident ($10,234), work life expectancy (an additional 34 years), and taking into consideration discounting, which Dr. Wolfson explained in detail, he concluded plaintiff's future wage loss was a minimal of either $107,423 or $165,718 (depending on whether plaintiff would be able to earn a lesser amount than formerly, as opposed to not being able to earn any income in the future). These figures do not include what this witness referred to as an improvement factor; they do include a 3% inflation rate.
To summarize: The overwhelming preponderance of the evidence is that plaintiff's injuries from the November 3, 1975 accident resulted in a myelogram in February, 1976, and extensive back surgery in March, 1976, which surgery included a laminectomy, laminotomy, and spinal fusion. The spinal fusion was unsuccessful and further surgery may be needed to make the fusion solid. Plaintiff was required to wear a metal brace from four to six months. He cannot stoop, lift anything over 25-50 pounds for the remainder of his life, bend on a competitive basis, or work at any job *88 which requires such activity. Twenty-six years of age at the time of trial, he is despondent and discouraged by his problems, resulting in severe neurotic depressive reaction. All of the testifying doctors state he has a permanent residual physical disability from an estimated 25% (Dr. Adatto) to 10-15% (Dr. Levy). It appears clear this formerly active 25 year old has not, and in all probability will not, be able to continue his recreational activities, or other similar physical activities, for the remainder of his life, nor will he be able to engage in the type of remunerative employment for which he is qualified.
The only evidence contained in the record which in any way tends to lessen this summarization is the testimony of Dr. Levy. His testimony is restricted to his field of neurology and, despite his conclusion, he still estimated plaintiff's disability as 10-25% of the body as a whole.

DAMAGES
Thus, the evidence establishes that plaintiff has a serious and permanent disability as a result of the accident. In our view, he is entitled to recover stipulated medical expenses of $6,504.06, loss of wages to date of trial of $12,462, future loss of wages of $107,423, and an award for present, past and future pain and suffering in the sum of $150,000,[5] for a total award of $276,389.06.

INABILITY TO PAY AND WHAT PROPORTIONS OF THE AWARD, IF ANY, ARE DUE BY THE VARIOUS DEFENDANTS
In this case the Supreme Court has found the inability of the defendants to respond in damages is a proper subject of consideration in assessing damages. This, of course, is restricted to the inability of the individual defendants to pay more than the available insurance coverage;[6] it does not apply to the defendant insurers, who are solvent and whose liability is limited only by the terms of their respective policies.
Allstate is liable in solido with its insureds to the full extent of the $50,000 liability policy it issued to the defendant, Bellow.[7]
The extent of State Farm Mutual's liability presents a more difficult problem. At the time of the accident this insurer had in force a liability policy issued to plaintiff's employer, A. & A. Spice & Food Co., Inc., which covered the truck involved in the accident. That policy provided U/M coverage of $100,000 per person ($300,000 per occurrence). It also had five additional liability policies issued to plaintiff's employer covering various other of the employer's vehicles with additional aggregate coverage of $600,000 under U/M provisions. One of those policies provided $300,000 per person, $600,000 per accident U/M coverage, and one policy did not provide any U/M coverage. The remaining policies provided $100,000/$300,000 U/M coverage.
Plaintiff contends he is an insured under the U/M provisions and therefore should be permitted to stack coverage on all vehicles covered under these various policies, thereby exposing State Farm Mutual to a possible liability of $700,000.[8] The trial court did not reach the question of stacking because the amount of the award did not exceed the liability of the tort feasor's insurer, Allstate. We do not agree with this plaintiff contention relative to stacking.
The named insured under all of the State Farm Mutual policies is A. & A. Spice & Food Co., Inc., plaintiff's employer. Each policy defines the insured as follows:
"II. Definitions.
(a) `insured' means:

*89 (1) the named insured as stated in the policy (herein also referred to as the `principal named insured') and, while residents of the same household, the spouse of any such named insured and relatives of either;
(2) any other person while occupying an insured automobile; and
(3) any person, with respect to damages he is entitled to recover because of bodily injury to which this endorsement applies sustained by an insured under (1) or (2) above."
In Burns v. Fernandez,[9] recently handed down by this court, we held the premiums paid by that plaintiff's employer were not sufficient to permit stacking by the plaintiff, a "permissive user". Burns is materially indistinguishable from the instant case and, for the reasons expressed in Burns, we hold plaintiff cannot stack. Thus, under its various contracts with plaintiff's employer, the liability of State Farm Mutual is $100,000, the limit of the U/M provision in its policy on the truck driven by plaintiff and involved in the accident.
Testimony relative to inability to pay was given by Mr. Bellow and the other individual defendant, his daughter. Bellow testified he is a widower supporting seven children, ages 19, 17, 15, 14, 12, 11 and 3½. He receives $282 per month in social security benefits on his deceased wife's account on behalf of the children. He has a full-time job as an accountant, earning $15,000 per year. He owns his own home (mortgaged), 35 shares of Puttman Vista Funds which cost $500, but has a current market value of $350, no savings account, and two automobiles, a 1969 Chrysler, and a 1972 Impala (mortgaged). We note that at least one of the seven children is not a minor and another is close to majority.
Darlene Bellow Gusse had been married for 15 months at the time of trial and was expecting a child. She works as a clerk-typist for a local accounting firm at a salary of $480 per month. Her take-home pay is about $103-104 per week. She has a 1/10 interest in a home.
Clearly, the Bellows are unable to pay the full judgment to which plaintiff is entitled. Equally clearly, they are not able to pay that part of such a judgment which is in excess of the insurance coverage. However, we are of the opinion that, to some extent, they can and should respond to damages in excess of the amount plaintiff will receive from the two defendant insurers. The inability to pay doctrine was and is not intended to completely relieve a tort feasor from liability. As was said in Lacaze v. Horton:[10]
".... It must be borne in mind that this principle is not intended to completely relieve a defendant of liability for reparation of damages inflicted by his own negligence, nor should it be considered as justifying the reduction of the allowance of damages to a bare minimum. Either of these alternatives, in our opinion, would be an extreme application of the principle and would result in effecting a gross injustice toward a plaintiff, under the guise of the application of a humane consideration for the plight of an impecunious defendant."
While we ordinarily would not be disposed to follow the inability to pay doctrine in this case, we apply that doctrine because, as we understand the Supreme Court's opinion, we are required to do so. In our view, the fairest result we can reach regarding both the plaintiff and the individual defendants is to hold those defendants liable in solido in the amount of $50,000, which is one-third of the $150,000 general award to which plaintiff is entitled for pain and suffering.

THE THIRD PARTY DEMAND
In the trial court proceedings State Farm Mutual filed a third party demand against the Bellows for any amounts it might be held liable to pay plaintiff as a result of its U/M coverage. At the conclusion of the *90 trial the third party demand was dismissed as State Farm Mutual was found not liable on the principal demand. The plaintiff appealed but State Farm Mutual did not appeal, nor did it answer plaintiff's appeal.
The first question presented is whether or not the third party demand is before us on this appeal. For the reasons set forth in Bond v. Commercial Union Assur. Companies[11] we hold the third party demand is properly before us. Those reasons, which appear at page 619 of the reported opinion, are:
"We note that an `[a]ppeal is the exercise of the right of a party to have a judgment of a trial court revised, modified, set aside, or reversed by an appellate court.' (La.C.C.P. Art. 2082).
An appellee is required to answer an appeal only if he `desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant.... Additionally, however, an appellee may by answer to the appeal, demand modification, revision, or reversal of the judgment insofar as it did not allow or consider relief prayed for by an incidental action filed in the trial court.' (La.C.C.P. Art. 2133).
The party successful at the trial level cannot appeal the judgment to the Court of Appeal. Petition of Sewerage and Water Board of New Orleans, 248 La. 169, 177 So.2d 276 (1965). Defendants, Commercial Union and Lumbermen's Mutual, were successful at the trial level. Even though their third party demands were dismissed by the trial court, these defendants were not required to appeal from that dismissal under Articles 2083 and 2133 since they would be requesting relief incompatible with the judgment dismissing the plaintiffs' claims. Such relief could not be granted by this Court without first reversing the judgment on the main demand. To hold that
Articles 2082 and 2133 require Commercial Union and Lumbermen's Mutual to appeal or answer the appeal in order that this Court could hear their third party demands in the event the trial court judgment was reversed would extend these Articles to a situation which the Legislature never intended to be covered by the statute. Such an absurd result will not be imputed to those Articles. Emmons v. Agricultural Insurance Company, 245 La. 411, 158 So.2d 594 (La.1963)."
Since we have increased the jury's award on the main demand, we must now address ourselves to the rights of State Farm Mutual against the individual defendants on its third party demand.
The pertinent statute is R.S. 22:1406 D(4). This statute has been interpreted by the Louisiana Supreme Court in Niemann v. Travelers Ins. Co.,[12] as follows:
"Furthermore no provision of our statute grants the UM insurer a right to subrogation,5 that is, the right to exercise the legal rights and actions of its insured. Rather R.S. 22:1406 D(4) affords only certain reimbursement rights in the following language:
`D. The following provision shall govern the issuance of uninsured motorist coverage in this state.
. . . . .
`(4) In the event of payment to any person under the coverage required by this Section and subject to the terms and conditions of such coverage, the insurer making such payment shall, to the extent thereof, be entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury for which such payment is made, including the proceeds recoverable from the assets of the insolvent insurer.'
Defendant's claim to subrogation is based on a provision which it has written into the policy. And it is this subrogation policy provision which creates the need for the other policy clause at issue *91 here, consent to settle. It is our ultimate conclusion that the statute neither explicitly nor implicitly sanctions a clause such as consent to settle, which in operation serves to block the statutorily mandated UM coverage.
Just what are defendant's rights under R.S. 22:1406 D(4)? As we read the literal language of the statute, it is to receive (`be entitled to') the proceeds of any settlement or judgment which has resulted or might result (`resulting') from the exercise of the insured's rights against the uninsured tortfeasor (and by implication the underinsured tortfeasor)." (Emphasis ours).
Thus, an U/M motorist insurer has no right to claim against the tort feasor under subrogation principles. However, it may recover the proceeds of a judgment resulting from legal action by its insured against such a tort feasor. This right to "the proceeds" amounts to a right to be reimbursed from any sums actually recovered by its insured from the uninsured or underinsured tort feasor. A right to reimbursement from sums the insured in fact recovers strongly implies an U/M carrier's only cause of action is against its own insured for such reimbursement.
This interpretation was adopted by the Third Circuit in Bond v. Commercial Union Assur. Companies,[13] where the court noticed on its own motion (pursuant to C.C.P. Art. 927) that the U/M carrier had no cause of action against the defendant tort feasor and dismissed such a third party action against such a defendant.
As we understand Niemann and Bond, and we agree, the U/M insurer only has a cause of action against its insured, and then only for reimbursement of sums in fact received by its insured from the uninsured or underinsured tort feasor. Because there is no subrogation, the U/M insurer does not have a cause of action against the U/M tort feasor. Accordingly, we dismiss State Farm Mutual's third party demand against the individual defendants.
For the reasons assigned, the judgment appealed from is affirmed in part, amended in part and reversed in part. Accordingly, it is ordered that:
1. There be judgment in favor of plaintiff, Robert G. Suhor, Jr., and against the defendants, Donald Bellow, individually and as administrator of the estate of his minor child, Darlene M. Bellow, and Allstate Insurance Company, in solido, in the full sum of $50,000, together with legal interest thereon from date of judicial demand until paid;
2. There be further judgment in favor of plaintiff, Robert G. Suhor, Jr., and against the defendants, Donald Bellow, individually and as administrator of the estate of his minor child, Darlene M. Bellow, and State Farm Mutual Automobile Insurance Company, in the full sum of $100,000, together with legal interest thereon from date of judicial demand until paid;
3. There be further judgment in favor of plaintiff, Robert G. Suhor, Jr., and against the defendant, Donald Bellow, individually and as administrator of the estate of his minor child, Darlene M. Bellow, in solido, in the full sum of $50,000, together with legal interest thereon from date of judicial demand until paid.
As thus amended and changed, and in all other respects, the judgment appealed from is affirmed.
All costs in all courts are to be paid by the two corporate defendants, Allstate Insurance Company and State Farm Mutual Automobile Insurance Company.
AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART.
REDMANN, Judge, dissenting in part.
I join in Judge Gulotta's observations (as I did in Judge Beer's, 377 So.2d at 1263) concerning the preferability of remanding a case like this to the trial court, but I agree the remand to us obliges us to fix quantum.

*92 I.
The repudiated jury award of $25,000 would have been affirmable on this record (ignoring the ability-to-pay evidence) as within the jury's "much discretion." La.C.C. 1934(3), although testing the lower limit of that discretion, under these circumstances:
1. Plaintiff's testimony on the occurrence of the accident is interpretable as inconsistent: he says he had not started up after the light turned green, yet he says the contents of his van slid forward on impact, into the back of the driver's seat, which (because of the commonly-experienced Newton's law that a body in motion tends to remain in motion and one at rest tends to remain at rest) they could do only if the van were previously moving forward. Their sliding forward is explicable by an inference that, having started up with the green light, plaintiff jammed on his brakes (as defendant driver testified), either because the car in front of him made a sudden near-U-turn back on to the service road or because plaintiff himself suddenly realized he wanted to make that turn. Although plaintiff's sudden stopping might not relieve defendants of liability, the inconsistency of his testimony might reduce plaintiff's credibility.
2. Photographs of plaintiff's van show it was not damaged except for a bent rear bumper.
3. Plaintiff did not suffer any painful injury at the time of the accident, but believed himself uninjured.
4. Plaintiff's own psychiatrist likened him, in his desire for compensation for his injury, to a car owner who because of a "little scratch ... may be extremely disturbed and insist on compensation well beyond the actual damage ... [more like] someone who goes mad literally than someone on the other end of the continuum [between two extremes of reaction to slight damage] that says `forget it.'" Thus the psychiatrist's testimony further detracts from plaintiff's credibility as a witness.
5. Plaintiff's own orthopedic surgeon testified that the purpose of the surgery was to relieve pressure on the nerve and thus relieve pain; that surgeons hoped not to have any motion after the fusion attempt, "ideally it is a solid procedure all the way around but a little motion is acceptable." "Q. Do you feel that Mr. Suhor can go back to work ...? A. I find it much easier to say what the person cannot do rather than can. For example,... some truck drivers can drive trucks, some unload trucks as well as drive, so I don't say he drives trucks but he can. Q. The only thing he can't do is excessive stooping or bending or lifting? A. Correct .... Q. I believe you indicated that you told him that he should go back to work consistent with the limitations that you specified? A. Right, the limitations what he can't do and it is up to a person to find out what he can do with the limitations."
From all of these circumstances the jury could reasonably have concluded that plaintiff was exaggerating his inability to work, by simply not working, and that defendants were not even fully responsible for the $12,000 earnings plaintiff had lost or merely declined to earn since the accident in his inordinate desire for compensation. Moreover, the jury could have concluded that plaintiff was not significantly disabled in respect to future earning capacity, notwithstanding an "anatomical" ("not a functional") disability of 10 to 15% in neurosurgeon Levy's view or 25% in plaintiff's orthopedist's view. Thus the jury could have concluded that pecuniary damages were $6,500 (or less) for medical expenses and a few thousand dollars for past and future lost wages, and allowed $10,000 to $15,000 general damages for their total award of $25,000. I would think that general damages award strained mightily the lower limit of the jury's "much discretion" but I should not attempt to articulate that it transgresses it. In Bolin v. National Tea Co., La.App. 1 Cir. 1978, 359 So.2d 690, writ refused La., 362 So.2d 577, the courts upheld a jury award of only $10,000 general damages for a ruptured disc that required surgery twice *93 (although one doctor thought the second rupture and surgery on the same disc not related to the accident), caused pain for over a year and a half, and left plaintiff with ten to 25% permanent disability.

II.
The Supreme Court has ruled, however, that our jury's award was tainted by the trial judge's treatment of ability to pay and of insurance coverages, and has remanded to us for an independent evaluation of damages.
I see this case in the same manner outlined above as I believe the jury saw it, although I would be much more generous on quantum. I would, moreover, allow plaintiff added medical expenses for a second fusion attempt if he desires it, plus a lower five-figure amount for all lost wages, and much more substantial general damages for the ruptured discs and surgery (even conceding that there were no other injuries, not a broken bone or cut or even a bruise). As one of a panel of judges I would adjust my own figures (as would the other judges) to reach a consensus figure agreeable to the panel if possible. Here, however, my under-$100,000 estimate (not yet considering defendants' poverty) would be accommodable with Judge Gulotta's $100,000 total but not with the majority's $300,000 (reduced to $200,000 for defendants' poverty).

III.
I further dissent from the majority's rejection of uninsured motorist insurer State Farm's third-party demand against the Bellows.
The Supreme Court declares, 388 So.2d at 757, n.5,
Although insurance was available to plaintiff under the uninsured motorist provisions of the State Farm Mutual policies, such insurance was not available to Mr. Bellow and Mrs. Gusse because the uninsured motorist insurer, if cast in judgment, would be entitled to indemnity from them.
In view of that express reasoning (impliedly overruling or at least narrowing Niemann v. Travelers Ins. Co., La. 1979, 368 So.2d 1003), we are obliged to render judgment over in favor of State Farm against the Bellows for the amount of the judgment against State Farm.
GULOTTA, Judge, dissenting.
Considering the testimony of Suhor, together with that of Doctors Adatto, Miller, Levy and Wolfson, I respectfully dissent from the amount of the amended award reached by the majority.
Suhor was a van driver for a company that supplied spices to various super markets. At the time of the rear-end collision, he sustained injury to his back. He testified that he had previously lifted packages in excess of twenty pounds, but after the accident could not return to his job because he was told by Adatto not to bend, stoop, or lift in excess of twenty pounds. Post-accident he did work at Banner Chevrolet transporting vehicles from one city to another and additionally did odd jobs. Based on Wolfson's calculations this 27-year old, with a 34-year life expectancy, earning approximately $10,000.00 per year, would suffer a minimum loss of $159,000.00 total, plugging in discounts and inflation. This amount is based upon a restricted earning capacity of approximately $3,600.00 per year. (I am not sure whether the $159,000.00 figure or a subsequently discussed $107,000.00 figure takes into account the $3,600.00 per year restricted earnings.)
Doctor Adatto acknowledges that the fusion following the laminectomy was not solid and that there was movement in one of the two places of the fusion. He testified that Suhor had a 25% disability of the body and could not return to work which involved lifting in excess of 25 to 50 pounds.
Doctor Miller indicated that Suhor suffered from lack of self esteem because of his limited work and earning capacity.
Doctor Levy, on the other hand, testified that, from a neurological standpoint, Suhor was not restricted from doing anything that he might have done before the accident.
*94 In a dissent from the original opinion rendered in this Court, I expressed the belief that the posture of this case, when the matter was submitted to the jury in the trial court, required a remand for a new trial. My belief is buttressed by the language of the Supreme Court in Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707, Sup.Ct., September 3, 1980, where the court stated:
"... Where a finding of fact is interdicted because of some legal error implicit in the fact finding process or when a mistake of law forecloses any finding of fact, and where the record is otherwise complete, the appellate court should, if it can, render judgment on the record.
This is not to say, and Gonzales [v. Xerax Corp., La., 320 So.2d 163 (1975)] should not be read to require, that the appellate court must find its own facts in every such case. There are cases where the weight of the evidence is so nearly equal that a first-hand view of witnesses is essential to a fair resolution of the issues. The appellate court must itself decide whether the record is such that the court can fairly find a preponderance of the evidence from the cold record. Where a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial...." At page 708.
Nonetheless, the Supreme Court in Suhor v. Gusse, 388 So.2d 755 (La. 1980), on the same day that the Ragas opinion was rendered, mandated that we make "an independent evaluation" of the damages due plaintiff in this case and not remand this matter to the trial court. Obliged by the mandate of the Supreme Court in this case, and considering the "inability to pay" doctrine, together with the "independent evaluation" of the evidence concept, I conclude that a $100,000.00 amended award is proper.

ON APPLICATION FOR REHEARING
PER CURIAM.
On plaintiff's demand for cumulating the uninsured motorist coverages of defendant's six separate insurance policies, Seaton v. Kelly, 339 So.2d 731 (La. 1976), controls. There, as here, an owner had separate policies on his vehicles, a Ford and a Volkswagen. Seaton was injured by an uninsured motorist while a passenger in the Ford. The court awarded the UM limit of the policy insuring the Ford, but expressly rejected Seaton's claim for the UM limit of the policy insuring the Volkswagen. The Supreme Court reasoned, at pp. 733 and 735,
The issue is not whether plaintiff can "stack" the uninsured motorist coverages on the two policies issued to Kelly. The question of "stacking" only arises once it is determined that the person seeking to cumulate benefits on two or more uninsured motorist coverages is an insured under the terms of those policies ....
... Since by the clear terms of the policy in this case ..., the plaintiff was not occupying the automobile "described in the policy for which a specific premium charge indicates that coverage is afforded..." (the Volkswagen), he was not occupying the "insured automobile." As such he was not an "insured" under the Volkswagen policy and is, therefore, not entitled to the benefits contained therein.
The case before us is identical in respect to stacking; it is a case in which stacking does not become an issue because plaintiff is not an insured under any policy except the one covering the vehicle he was occupying. He is therefore not entitled to any benefits provided by any other policy.
Seaton requires us to reject, insofar as it applies to a mere occupant, the contrary (and unexplained) reasoning by Wilkinson v. Fireman's Fund Ins. Co., 298 So.2d 915, 918 (La.App. 3 Cir. 1974), writ refused La., 302 So.2d 306 and 308, that "if we had six distinct policies [instead of two three-car policies] it is clear ... that plaintiff [a named insured as to one but only an occupant as to the other three-car policy] could recover the full minimum $5,000 under each of the six policies since his damages exceed $30,000."
*95 The decisions in Barbin v. United States F. & G. Co., 315 So.2d 754 (La. 1975), and Wilkinson, above, and the obiter dictum[1] of Holmes v. Reliance Ins. Co., 359 So.2d 1102 (La.App. 3 Cir. 1978), writ refused La., 362 So.2d 1120, might support a different result because they appear to assume (as Wilkinson explicitly reasons, as just noted) that a mere occupant of one vehicle can recover on each separate policy insuring the host owner. But, apart from their implied conflict with Seaton, the supreme court's latest decision in this area, the declarations of Barbin, Wilkinson and Holmes are not applicable to our case, because those cases involve a single policy with more than one vehicle insured rather than separate policies.
Plaintiff's application for rehearing is therefore denied.
Defendant State Farm's application for rehearing is also denied.[2]
NOTES
[1] Suhor v. Gusse, La.App., 388 So.2d 755.
[2] Now Mrs. Darlene B. Gusse, wife of Richy J. Gusse. We note that an exception to State Farm Mutual's third party demand against this defendant (alleging she is of the full age of majority), which exception is based on minority at the time of the accident, was overruled.
[3] It was further ordered that State Farm Fire & Casualty be given preference in the judgment for $12,539.06, workmen's compensation previously paid plaintiff. Plaintiff's claim against State Farm Mutual, its third party demand, and State Farm Fire's intervention against State Farm Mutual were dismissed.
[4] La.App., 377 So.2d 1259 (on rehearing).
[5] See Daigle v. Lang, La.App., 377 So.2d 1384, and Novick v. Textron, La.App., 375 So.2d 730.
[6] La., 388 So.2d 755, 757.
[7] See Holmes v. Reliance Ins. Co., La.App., 359 So.2d 1102.
[8] At the time of this accident on November 3, 1975, R.S. 22:1406 had not been amended so as to prevent stacking. That amendment, Act 623 § (1), was passed by the legislature in 1977.
[9] No. 11,481 of our docket, 401 So.2d 1033, handed down June 10, 1981.
[10] La.App., 100 So.2d 252, 255.
[11] La.App., 387 So.2d 617.
[12] La., 368 So.2d 1003, at 1006.
[13] Supra, note 11.
[1] Holmes speaks of stacking a 160-vehicle policy's coverage but in fact its sole award on that policy was only $8,428, far below the single-vehicle limit of $15,000 per person. Thus Holmes in fact did not allow stacking, and the discussion of stacking was unnecessary to the decision.
[2] Redmann, J., dissents from refusal of rehearing to State Farm, especially as to the third-party demand, because of the supreme court's declaration, in remanding this very case to this court, 388 So.2d 755, 757, n.5, "the uninsured motorist insurer [State Farm], if cast in judgment, would be entitled to indemnity from [Mr. Bellow and Mrs. Gusse]," and State Farm's third-party demand thus asks exactly what the supreme court has said State Farm should have.