604 So.2d 150 (1992)
Jerry GRAVES, Plaintiff-Appellant-Appellee,
v.
LOU ANA FOODS, INC., et al., Defendants-Appellees-Appellants.
No. 90-1415.
Court of Appeal of Louisiana, Third Circuit.
July 2, 1992.
Rehearing Granted August 13, 1992.
*153 Edward F. Downing, III, Metairie, for plaintiff-appellant-appellee Graves.
Jeansonne & Briney, Craig W. Marks, Lafayette, for defendant-appellee-appellant Lou Ana Foods.
Onebane & Donohoe, Keigh M. Borne, Lafayette, for defendant-appellee-appellant LaFleur Elec.
Judith Z. Gardner, Lafayette, for intervenor Aetna.
Before LABORDE and KNOLL, JJ., and MARCANTEL,[*] J. Pro Tem.
KNOLL, Judge.
This appeal concerns the tort liability of Lou Ana Foods, Inc. (Lou Ana) and its insurer, The Hartford Accident and Indemnity Company (Hartford), for orthopedic and burn injuries Jerry Graves received when he was electrocuted while installing electrical conduit at Lou Ana's facility in Opelousas.
A jury awarded Graves $90,000 for physical pain and suffering; $100,000 for mental pain and suffering; $10,000 for permanent disfigurement, disabilities and scarring; $15,000 for loss of earnings, past and future; and, $65,000 for medical expenses. The jury assessed 10% fault to Lou Ana, 40% fault to Graves, and 50% fault to Verbis LaFleur Electrical Services (LaFleur *154 Electrical), Graves's employer. The jury also determined that Lou Ana was not Graves's statutory employer, that LaFleur Electrical did not contract to indemnify Lou Ana, and that Graves was not entitled to exemplary damages.
Aetna Casualty and Surety Company (Aetna), LaFleur Electrical's worker's compensation carrier, was recognized as having paid worker's compensation and medical expenses to Graves, and entitled to reimbursement from the total award Graves received.
Post-verdict motions for judgment notwithstanding the verdict or a new trial filed by Graves, Aetna, Lou Ana, and Hartford were denied.
The appeals of Graves, Aetna, Lou Ana and Hartford present the following issues for our determination: (1) Did the trial court err in allowing the jury to consider the fault of Graves's employer, LaFleur Electrical? (2) Was Lou Ana the statutory employer of Graves? (3) Was Lou Ana liable for Graves's injuries? (4) How should fault be apportioned between Graves and Lou Ana? (5) What damages did Graves suffer? (6) Did LaFleur Electrical contract to indemnify Lou Ana? (7) How should the judgment be proportioned between Graves and Aetna, the intervening worker's compensation carrier? and, (8) What reimbursement does Aetna owe Graves for its share of litigation expenses and attorney's fees?

FACTS
On December 4, 1986, Graves, an employee of LaFleur Electrical, was seriously injured while working at the Lou Ana plant in Opelousas. At the time of the accident, Graves was installing metal electrical conduit on an existing pipe rack as part of a major construction project to add a hydrogenation processing unit to Lou Ana's operations. Among the items LaFleur Electrical was responsible for constructing was the installation of a start/stop button on a pump in Lou Ana's West Tank Field. To supply electricity to the pump an electrical line had to be run through metal conduit to the power supply. Lou Ana's specs required that Graves had to install the conduit on top of an existing 300 foot long pipe rack which had a height of approximately 23 feet. The pipe rack was not a walkway, and was used as a support construction for several pipelines used to supply Lou Ana's operation. Frank Burleigh, Lou Ana's plant supervisor in charge of outside contractors, walked with Graves along the top of this pipe rack and showed him exactly where he wanted the metal conduit mounted. We have attached below and identified the key reference points on a copy of a photograph marked Exhibit # P1 for identification which reflects the scene of the accident:
*155 
Exhibit P-1 shows the juncture of the north-south and east-west legs of the pipe rack. At this point four uninsulated high voltage wires diagonally cross 15 to 20 linear feet of the pipe rack. In addition, an electrical triplex line, an insulated three conductor cable, also diagonally crossed less than one foot above the pipe rack; this triplex line supplied electricity to an area light. The height of the high voltage lines above the pipe rack was disputed at trial since it was never measured prior to Graves's accident. Lou Ana contended that it was 10 feet or more; Graves contended that based on the physical evidence, it was less than 10 feet.
To install the start/stop device Graves climbed to the top of the pipe rack and walked to the juncture depicted above. Graves positioned himself on top of the pipe rack, approximately 23 feet high, with the triplex wire behind him and at a location near to the area where the pipe rack crossed under high voltage supply lines which carried 7,620 volts of electricity. Lou Ana owned both the high voltage lines and the pipe rack. Graves sat on one of the braces at the rack's corner with his legs wrapped around for support. Mark Deshotel, Graves's helper, placed a fiberglass ladder against the east-west wing of the pipe rack, climbed near the top, and began handing Graves 10 foot lengths of metal conduit. Graves took the metal conduit and stacked it, some on the northsouth wing and other on the east-west wing. He then started joining the conduit and sliding it coupling-end-first along the top of the pipe rack. After approximately an hour, Graves grabbed a piece of conduit and because it was stacked with the wrong end toward him, he had to reverse the conduit so that it could be properly joined. Graves then lifted a 10 foot section vertically above his head, accidentally contacting one of the uninsulated high voltage lines located above him. The electrical shock burned Graves's hands, thighs, buttocks, and pelvic area, and caused him to fall 23 feet to the ground. As a result of the fall, Graves also dislocated his left elbow, broke his right wrist, fractured a rib, and broke his left hip.
*156 Graves instituted this action for damages against Lou Ana, contending that the high voltage electric lines located approximately 10 feet or less above him as he worked on the pipe rack posed an unreasonable risk of harm. Aetna intervened in the tort suit to recover worker's compensation and medical benefits it paid to Graves.

ERRONEOUS JURY INSTRUCTION: COMPARATIVE NEGLIGENCE OF EMPLOYER
Graves contends that the trial court erroneously instructed the jury, over his timely objection, to determine whether his employer, LaFleur Electrical, was negligent and, if so, to assess the employer's negligence as a percentage of fault in relation to Graves and Lou Ana. Graves argues that the submission of such a jury interrogatory prejudiced him by allowing the employer's proportion of negligence to effectively reduce Lou Ana's assessment of fault. We agree.
In both Melton v. General Elec. Co., Inc., 579 So.2d 448 (La.1991), and Guidry v. Frank Guidry Oil Co., 579 So.2d 947 (La.1991), the Louisiana Supreme Court held that in cases arising before the 1987 amendment to LSA-C.C. Art. 2324, dealing with solidary liability, it is erroneous for the trial jury to consider the comparative negligence of an employer in a worker's suit against a third party tort feasor. We find the Melton and Guidry decisions dispositive of the issue presented herein, and conclude that these decisions require us to disregard the jury verdict.
Since we have a complete record before us, we do not find it necessary to remand this case for a new trial. Instead, we shall review the record evidence and provide a de novo review of the issues presented. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975).

LOU ANA'S STATUTORY EMPLOYER DEFENSE
Lou Ana and Hartford contend that under the analysis of Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986), Lou Ana was Graves's statutory employer and thereby immune from tort liability. They also argue that LSA-R.S. 23:1061, as amended in 1989, should be applied retroactively and that the liberal standard for principal tort immunity embodied therein should be applied to Lou Ana.
Reversing the order of argument, we find no merit to the contention that the 1989 amendment to LSA-R.S. 23:1061 should be applied retroactively. The Third Circuit has addressed this issue, stating that the amendments to R.S. 23:1061 are not to be applied retroactively since they constitute substantive changes. Fountain v. Central Louisiana Elec. Co., Inc., 578 So.2d 236 (La.App. 3rd Cir.1991), writ denied, 581 So.2d 707 (La.1991); Young v. Lyons Petroleum, Inc., 598 So.2d 702 (La. App. 3rd Cir.1992). Accordingly, we find no merit to this argument.
In Bowens v. General Motors Corp., et al., 596 So.2d 243, 246-247 (La.App. 3rd Cir.1992), writs granted, 600 So.2d 593 and 600 So.2d 594 (La.1992), we referred to well established law, holding:
"As stated in La.R.S. 23:1061, employees of contractors may be considered employees of the principal if certain conditions are satisfied. The hallmark case in this area is Berry v. Holston Well Service, Inc., 488 So.2d 934 (La.1986). While we recognize the amendment to the statute seems to alter the Berry analysis, we have found the amendment should only be applied prospectively, and thus, the Berry analysis will be applied in the present case. In Berry, the supreme court enunciated a three tier analysis for determining the existence of a statutory employment relationship. See also Lewis v. Exxon Corp., 441 So.2d 192 (La.1983).
`In the first level, the primary focus is on the scope of the contract work. "`The specific task to which an individual employee is put should not be determinative of his coverage under the Act. Instead, the entire scope of the work contract must be considered.'" Lewis, supra, citing Malone, Principal's Liability for Workmen's Compensation to Employees of Contractors, 10 La. L.Rev. 25 (1949). The central question to be answered is whether the contract work is specialized or non-specialized.

*157 This of course is a question of fact, and courts should consider whether the contract work requires a degree of skill, training, experience, education and/or equipment not normally possessed by those outside the contract field. If it is determined that the contract work is specialized per se, as a matter of law the work is not a part of the principal's trade, business or occupation, and the principal is not the statutory employer of the specialized contractor's employees. In this situation, "`the purpose behind the rule is not violated and the reason for holding the principal directly liable in compensation exclusively does not come into play'" because the contractor is an independent business enterprise, rather than a mere intermediary interposed to avoid compensation responsibility. Williams v. Shell Oil Co., 677 F.2d 506 (5th Cir.1982) (Tate, J. writing for the panel), citing 13 W. Malone & H. Johnson, La.Civil Law TreatiseWorker's Compensation, Sections 78, 126 (1980).
If it is determined that the contract work is non-specialty, then the inquiry shifts to a comparison of the principal's trade, business or occupation and the contract work to see if the latter can be considered a part of the principal's trade, business or occupation. The jurisprudence has forged several guidelines, in no way exhaustive, which can aid a court in resolving this factual issue:
(1) Is the contract work routine and customary? That is, is it regular and predictable? Non-recurring or extraordinary constructions and repairs usually are outside the scope of the statute. On the other hand, general maintenance and repair work, which by their very nature allow the smooth and continued operation of the principal, are within the scope of coverage. Lewis, supra; Benson [v. Seagraves, 436 So.2d 525 (La.1983)], supra; Barnes, [ v. Sun Oil Co., 362 So.2d 761 (La.1978)], supra; Reeves v. Louisiana & Arkansas Railway Co., 282 So.2d 503 (La.1973).
(2) Does the principal have the equipment and/or manpower capable of performing the contract work? This is a subspecies of the specialty inquiry, supra. Here the primary focus is on determining whether the contract work as relates to the principal is handled ordinarily through employees. Lewis, supra, citing 1C.A. Larson, The Law of Workmen's Compensation, Section 49.12, at 9-41 (1982).
(3) What is the practice in the industry relative to the contract work? Do industry participants normally contract out this type of work or do they have their own employees perform the work? See Reeves, supra; Brown v. Kaiser Aluminum and Chemical Corp., 289 So.2d 524 (La.App. 1st Cir. 1973), writ not considered 293 So.2d 171 (La.1974); Malone & Johnson, supra, Section 126, pp. 252-53, fn. 91. These guidelines are not absolute or rigid, but are instead to be applied relatively, taking into consideration the size, complexity, integration (either horizontal or vertical), or the lack thereof, etc. of the principal. What may be nonrecurring to a small concern, may for an industry giant be regular. Similarly while the type of contract work may be non-specialized (i.e. manual labor), for a small concern it may well be beyond the expertise or capability of its employees. 1 A. Larson, Workmen's Compensation for Occupational Injuries and Death, Section 49.13 (Desk ed. 1985). Basically, the factors developed by the jurisprudence strive to answer the overriding question of "`whether [the contract work] is, in that business, normally carried on through employees rather than independent contractors.'" Id. (emphasis added)
Lastly, the court must determine if the principal is engaged in the work at the time of the alleged accident. La.R.S. 23:1032. At this level "`[i]t is irrelevant that the principal has the financial resources or expertise to enter into a *158 particular trade, business or occupation. In order for any person to come within the scope of the statute, he must be engaged in the enterprise at the time of the injury.'" Lewis, supra. Berry, supra, pp. 937-939."
From the outset we note that part of the argument of Lou Ana and Hartford is that the trial court erred in failing to give six proposed jury instructions on the issue of Lou Ana's statutory employer defense. Because this is a de novo review, we need not address this contention. Nevertheless, we note that if their argument could have been urged, our diligent search of this voluminous record has failed to find the proposed jury instructions relied upon.
In the case sub judice, it is undisputed that the work performed by LaFleur Electrical and Graves at the time of the accident was not specialized per se. Accordingly, the remaining elements of the Berry analysis must be reviewed.
The thrust of the next level of inquiry entails a determination of whether the contract work being performed by LaFleur Electrical and its employee, Graves, is a part of Lou Ana's trade, business or occupation. The standards examined are whether the work is routine, customary, regular or predictable, and whether the principal has the equipment and manpower capable of performing the contract work.
Lou Ana is in the business of manufacturing and processing various food products. Two mechanical engineers, Warren Barnes and Larry LaFleur, are employed full time. Likewise, Lou Ana has a full time maintenance division which employs three electricians. These electricians are supervised by Charles Vidrine, Lou Ana's maintenance manager.
Warren Barnes, Lou Ana's vice-president in charge of production at the time of Graves's accident, testified that in 1986 Lou Ana decided to install a hydrogenation process at its Opelousas facility. Lou Ana acquired the design and parts necessary for constructing the hydrogenation process from EMI. Barnes stated that the construction of the hydrogenation process was a non-recurring activity and because of its cost of $1.8 million it constituted an extraordinary project.
The record shows that Lou Ana decided to utilize outside electrical contractors to completely install the hydrogenation process because of its corporate decision to have the new process operational according to a preplanned schedule. Because of the need for Lou Ana's three full-time electricians in the ongoing maintenance of the plant, these workers logged only 9¾ hours in the installation of this new system. On the other hand, LaFleur Electrical performed $27,000 of work in the installation of the hydrogenation system, and another electrical contractor was paid $15,000 for other portions of the new construction.
Based on these facts, we find no error in the trial court's pre-trial rulings on motions for summary judgment, denying Lou Ana's assertion of the statutory employer defense. Despite the fact that the work Graves was performing when he was injured might have been routine, his work and that of LaFleur Electrical was clearly part of a nonrecurring, extraordinary construction project which was beyond the realm of what may be considered routine maintenance performed in the course of Lou Ana's trade, business or occupation. Accordingly, we find no merit to Lou Ana's renewed assertion of the statutory employer defense.

LIABILITY
Lou Ana and Hartford contend that Lou Ana was not guilty of negligence which was a cause-in-fact of the damages Graves suffered. They argue that Graves's own negligence was the sole cause of his injuries.
On the other hand, Graves contends that Lou Ana created a trap for Graves by having the uninsulated high voltage lines and the triplex line cross over the pipe rack. He argues that Lou Ana knew that he would be handling conductive materials 10 to 20 feet in length and it neither warned him of the danger posed by the uninsulated high-power lines nor provided *159 temporary insulation while he worked on the pipe rack.
From the outset, we must determine whether Lou Ana's liability should be assessed any differently since it was not a power company.
Lou Ana asserts in brief that it is not a power company engaged in the generation and distribution of electricity. Although we do not dispute Lou Ana's contention, we find that it should be held to the same standards as a power company. In Levi v. S.W. La. Elec. Membership Co-Op., 542 So.2d 1081, 1084 (La.1989), the court stated, "... [A] company which maintains and employs high-power lines is required to exercise the utmost care to reduce hazards to life as far as practicable." Certainly, Lou Ana is a company which maintains and employs high-power electrical lines in the course of its production of oils and food products. It is likewise obvious that the common thread which binds Lou Ana and power companies to the same standard is their use of high voltage electricity which endangers those who work near electrical lines. Accordingly, we will utilize the same duty-risk analysis and the standards developed in the jurisprudence for power companies in our analysis of Lou Ana's liability.
In Levi the Supreme Court analyzed the power company's liability, utilizing a two step inquiry: (1) whether the power company was required to recognize the hazard; and, (2) whether the hazard was an unreasonable risk of harm.
With regard to the first step, the Levi court stated at page 1084 of its opinion:
"A power company is required to recognize that its conduct involves a risk of causing harm to another if a reasonable person would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence and judgment as a reasonable person would have. If the company has in fact more than a minimum of these qualities, it is required to exercise the superior qualities that it has in a manner reasonable under the circumstances. The standard becomes, in other words, that of a reasonable person with such superior attributes.
It is well recognized that those who engage in certain activities or come into certain relationships with people or things are under a peculiar obligation to acquire knowledge and experience about that activity, person or thing.
* * * * * *
By the same token, a company which maintains and employs high power lines is required to exercise the utmost care to reduce hazards to life as far as practicable. Pursuant to this duty, a power company has an obligation to make reasonable inspections of wires and other instrumentalities in order to discover and remedy hazards and defects. Consequently, a company will be considered to have constructive knowledge of an electrical hazard which has existed for a period of time which would reasonably permit discovery had the company adequately performed its duties." (Citations omitted.)
In the case sub judice, Larry LaFleur, Lou Ana's manager of engineering, testified that Lou Ana owns the uninsulated high voltage lines and the pipe rack at issue. Lou Ana accepts electricity from a transmission line owned by a public utility and steps down the voltage for use at its Opelousas plant. Because Lou Ana uses a large amount of electricity, approximately one million kilowatt hours a month, it is billed by the public utility at a large service rate.
Both the pipe rack and high voltage lines were installed by Lou Ana's contractors in 1977. The clearance between the pipe rack and high voltage lines was never measured by Lou Ana prior to Graves's accident. Because of the lack of objective evidence on this measurement at the time of the accident, much of the testimony of the expert electrical engineers, Roy Martin for Graves and Dr. Eugene Tims for Lou Ana, centered on the resolution of this question. Based on our appreciation of the description of physical evidence, i.e., the arc marks on the 10 foot length of conduit *160 and the four inch pipe atop the pipe rack in close proximity to where Graves was perched for support, and Graves's description of his actions just prior to his electrocution, we find that the evidence preponderates that there was less than a 10 foot height differential between the pipe rack and the high voltage wire which Graves contacted.
Likewise there was significant testimony by Martin and Tims on the applicable industrial safety standards relative to the safe distance required for the separation of high voltage lines and constructions such as the pipe rack, and whether Lou Ana complied with these regulations. It is well established in the jurisprudence that mere compliance with safety standards does not per se relieve one from negligence. Horton v. Valley Elec. Membership Corp., 461 So.2d 375 (La.App. 2nd Cir.1984). Rather than detail the significant differing opinions of Martin and Tims, even as to the structural classification of the pipe rack, we find that a statement of agreement by both is most helpful to us in our determination of the issue of Lou Ana's liability herein. Namely, both agreed that the determination of the appropriate clearance between the pipe rack and the high voltage lines should include a consideration of the anticipated activities conducted in proximity to the high voltage lines.
With regard to construction activities on the pipe rack, Burleigh, Lou Ana's plant supervisor, testified that workers have performed various tasks on the pipe rack on approximately five or six occasions since the construction of the pipe rack and the high voltage lines. During those operations, pipes of 10 to 20 feet in length were installed on the top of the pipe rack. Moreover, Burleigh testified that he instructed Graves in the present case to install the conduit on the entire length of the pipe rack. He further testified that he knew that the conduit utilized by Graves came in 10 foot lengths, and that the high voltage lines crossed the corner of the pipe rack. Despite this, he stated that he neither warned Graves of the danger of the high voltage lines nor took protective measures to guard Graves from contacting the energized lines.
Viewing these facts, we conclude that Lou Ana, the owner of the high voltage lines, with its knowledge of the activities which took place on the pipe rack at its direction, coupled with its placement of the high voltage lines across the corner of the pipe rack, should have recognized that its conduct under these circumstances involved a great risk of foreseeable harm to Graves.
In reaching this conclusion, we find no merit to Lou Ana and Hartford's contention that Graves's own negligence was the cause of his injuries. To this extent the following language in Levi, supra at page 1086, is applicable:
"The power company complains that it should not be charged with recognition of any risk that takes effect through a victim's negligence. But the ordinary reasonable person, and even more so the power company, is required to realize that there will be a certain amount of negligence in the world. When the risk becomes serious, either because the threatened harm is great, or because there is an especial likelihood that it will occur, reasonable care may demand precautions against `that occasional negligence which is one of the ordinary incidents of human life and therefore to be anticipated.' It is not due care to depend on the exercise of care by another when such reliance is accompanied by obvious danger." (Citations omitted.)
We likewise are not swayed by Lou Ana's position that its supervisor, Burleigh, never saw Graves on top of the pipe rack and that Graves could have chosen a different way to do the job. We find that it was reasonable for Lou Ana to expect that Graves would have to mount the pipe rack since Burleigh had to mount the pipe rack to show Graves where to locate the conduit. Likewise, since it was necessary to lay the conduit on both legs of the pipe rack, it was not unreasonable for Lou Ana to expect that Graves would have to position himself at some point on the pipe rack beneath the high-power lines.
*161 We now consider whether the hazard created by Lou Ana constituted an unreasonable risk of harm.
In Dobson v. Louisiana Power & Light Co., 567 So.2d 569, 574 (La.1990), the Supreme Court stated:
"The generally accepted view is that negligence is defined as conduct which falls below the standard established by law for the protection of others against an unreasonable risk of harm. The test for determining whether a risk is unreasonable is supplied by the following formula. The amount of caution `demanded of a person by an occasion is the resultant of three factors: the likelihood that his conduct will injure others, taken with the seriousness of the injury if it happens, and balanced against the interest which he must sacrifice, or the cost of the precaution he must take, to avoid the risk.' If the product of the likelihood of injury multiplied times the seriousness of the injury exceeds the burden of the precautions, the risk is unreasonable and the failure to take precautions or sacrifice the interest is negligence. The foregoing conception has been referred to by legal scholars as the `Hand formula,' the `Learned Hand test' or the `risk-benefit' balancing test." (Citations and footnotes omitted.)
Furthermore, in Levi, supra at 1086, the Supreme Court elaborated:
"The amount of caution tends to increase with the first factorthe likelihood that the actor's conduct will injure others. Other things being equal, the amount of care required will vary directly with the degree of likelihood of injury.
The amount of caution required also tends to increase with the second factorthe seriousness of the injury if it happens. If the harm that may be foreseen is great, conduct that threatens it may be negligent even though the statistical possibility of its happening is very slight.
The third variable factorthe interest the defendant must sacrifice or the burden he must assume in order to avoid the riskworks in the opposite direction and may sometimes be entitled to enough weight to prevent conduct from being negligent even where it involves virtual certainty of very great harm. The interest that must be sacrificed or the burden that must be assumed to avoid the risk is balanced against the danger. At this point there is the greatest need for careful analysis so as to focus attention on the precise interest that would be sacrificed, or the precise burden that would be assumed, and this in turn will depend on precisely what act or omission is challenged as negligent. The interest whose sacrifice is in question on the issue of negligence is the value of the particular act or omission that is challenged as negligent. Looked at another way, it is the burden of refraining from the particular act or of taking an effective precaution to cover that particular omission. It is not the value of the activity or enterprise as a whole, or the detriment that would flow from its abandonment. Thus, the cost of precautions to avoid a recognizable risk is relevant, but the law imposes liability for failure to take precautions, even against remote risks, if the costs of the precautions would be relatively low.
The facts of ... power line cases invite a sharp focus upon the essential balancing process that lies at the heart of negligence. In such a case, a paraphrase of the Hand formula helps to bring the elements of the process into relief: Since there are occasions when high voltage electricity will escape from an uninsulated transmission line, and since, if it does, it becomes a menace to those about the point of its escape, the power company's duty, as in other similar situations, to provide against resulting injuries is a function of three variables: (1) the possibility that the electricity will escape; (2) the gravity of the resulting injury, if it does; (3) the burden of taking adequate precautions that would avert the mishap. When the product of the possibility of escape multiplied times the gravity of the harm, if it happens, exceeds the burden of precautions, the failure to take those precautions is negligence.

*162 The cost of prevention is what Hand meant by the burden of taking precautions against the accident. It may be the cost of installing safety equipment or otherwise making the activity safer, or the benefit foregone by curtailing or eliminating the activity. No one, including Judge Hand thought reasonable care can be measured with mathematical precision, however. His formula in [U.S. v.] Carroll Towing [159 F.2d 169 (2d Cir. 1947)] merely suggests the kind of evidence that is relevant on the issue of reasonable care and how it should be weighed." (Citations and footnotes omitted.)
Applying this analysis to the present case, the record shows that the uninsulated high voltage lines crossed over the pipe rack on which Graves was required to place conduit at Lou Ana's facility. Likewise, the evidence shows that the 23 foot high pipe rack on which Graves was working was the tallest in the Lou Ana facility. As pointed out hereinabove, Lou Ana had not measured the distances between the pipe rack and high voltage lines prior to Graves's non-lethal electrocution. Nevertheless, Lou Ana directed Graves to install 10 foot lengths of conduit on the top of the pipe rack. Because of Graves's required work on the pipe rack and other work activity involving long pieces of conductive material carried on earlier beneath the high voltage lines, we find that Lou Ana's reliance on the fact that the power lines were insulated by isolation is misplaced. Under these circumstances, we find that Lou Ana's placement of the high voltage lines across the corner of the pipe rack posed a great risk that a person working with lengthy conductive metal on the elevated pipe rack might contact the uninsulated high voltage wires.
In assessing Lou Ana's duty we find the following facts illustrative of the unreasonable risk of foreseeable harm presented. Graves admitted that he did not notice the high voltage wires above him on the pipe rack. He testified that he concentrated on accomplishing his work on the pipe rack and that as he balanced on the elevated structure he focused on the danger of the electric triplex line located inches above the pipe rack. Graves testified that although the triplex line was insulated, since it was exposed to the elements the insulation is often cracked and can thus pose a threat of electrocution to persons who may contact the triplex line. Expert testimony showed that it is difficult to judge distances between structures and high voltage lines suspended in the air above. Graves's helper, Mark Deshotel, testified that he saw the high voltage wires as he worked on the ladder which was propped against the pipe rack; however, he stated that he did not perceive the high voltage wires as posing a danger because of the distance he thought they were from the top of the pipe rack.
In light of these facts, the record preponderates that Lou Ana could have taken precautions which would have eliminated or lessened the danger of electrocution. Since Lou Ana knew that Graves would have to install conduit along the pipe rack in close proximity to the high voltage lines, its supervisor could have called the danger to Graves's attention. Likewise, the record shows that these lines could also have been deenergized while Graves worked or the lines could have been insulated at a cost of less than $2,000. In this instance, we find that unlike a power company which has untold miles of uninsulated power lines, Lou Ana could have easily protected workers from electrocution by simply insulating this relatively short section of high voltage line across the pipe rack.
In making this assessment, we are mindful of Lou Ana's contention that Verbis LaFleur, Graves's employer, warned Graves of the electrical lines. This is denied by Graves. Graves testified that no one warned him about any of the power lines. On his own, he warned his helper, Deshotel, about the triplex line. Deshotel testified that Graves did warn him about the triplex line. After carefully reviewing the jurisprudence, whether LaFleur warned Graves or not is of no moment because Lou Ana cannot delegate the duty to warn when it created a forseeable danger to workers at its facility. Levi, supra.
*163 Lou Ana further argues that it had no duty to warn Graves because Graves was an electrician and knew the danger posed by the high voltage lines. In other words, Lou Ana's position is that its duty is discharged by Graves's knowledge of electricity. We disagree. Here, too, we draw Lou Ana's attention to the following language found in Levi, supra at 1089:
"The power company argues generally, however, that no warning would have been effective as to Levi because he knew of the existence of the uninsulated line and nevertheless encountered the danger. The purpose of a duty or standard of care requiring a warning, however, is to attract and arrest the attention of a potential victim. It assumes both the possibility and probability of his inattention. Although such a legal obligation is not imposed to protect the utterly indifferent or foolhardy, at the same time, however, its protection is not restricted to those whose senses are precisely attuned to the prospect of the particular warning called for."
As in Levi, supra, there is nothing in the record which shows that Graves would have ignored a direct warning by Lou Ana regarding the high voltage lines. To the contrary, we find the record supports that a warning would have been effective. On this issue, we find it convincing that Graves's concern about the triplex line made him avoid contact with this line. The record evidence preponderates that a lack of warning caused him to not recognize the forseeable danger that existed in the power lines above, therefore his concern centered only on the triplex line. We find this argument by Lou Ana should be urged as to allocation of fault, but we do not find that Graves's knowledge of electricity absolves Lou Ana of fault.
Therefore, for the foregoing reasons, we find that Lou Ana had a duty to protect Graves under these circumstances, that it breached its duty, that its fault was a cause-in-fact of Graves's injury, and that it is responsible, at least in part, for the injuries Graves suffered.

APPORTIONMENT OF FAULT
We are now called upon to apportion fault between Graves and Lou Ana.
Elements of Lou Ana's fault have been detailed hereinabove and will not be reiterated.
Focusing now on Graves's fault, our careful review of the record shows the following facts. The uninsulated high voltage lines were readily visible from Graves's position atop the pipe rack. There is likewise evidence that prior to commencing work on the pipe rack Graves did not adequately survey the area for dangers presented and that he never looked for the lines, despite the presence of electrical poles in the vicinity of the pipe rack. Lastly, we note that Graves was an experienced, but unlicensed electrician who was familiar with the dangers of electrical current.
Considering the superior duty of Lou Ana as expounded upon hereinabove in our discussion of the Hand formula, we find that fault should be assessed 60% to Lou Ana and 40% to Graves.

INDEMNITY
Lou Ana and Hartford contend that LaFleur Electrical owed it a complete defense against Graves's damage action and indemnification for all amounts it may have to pay.
The basis of Lou Ana's assertion is language which appears on the reverse side of the purchase order under which LaFleur Electrical was working at the time of the accident. Lou Ana argues that LaFleur Electrical agreed under Section 9 of the purchase order that it would:
"Defend and indemnify buyer [Lou Ana] against all claims, actions, liability, loss, damage, expenses and judgments including expenses of litigation resulting therefrom, arising or alleged to arise from injury to persons or damage to property due to defects or alleged defects and material or workmanship of any item or product delivered thereunder."
The purchase order was unsigned and the record is void of any evidence that Lou Ana *164 and LaFleur Electrical discussed the question of indemnification.
We find no merit to Lou Ana's third-party demand against LaFleur Electrical for indemnification. First, we find that in order for LaFleur Electrical to waive the exclusive worker's compensation remedies available to it as Graves's employer, even as to a waiver in favor of a third party, the evidence must show that LaFleur Electrical knowingly waived such tort immunity; no such showing has been made. Secondly, construing the language of indemnification as written by Lou Ana, we do not find that it is applicable to the damages suffered herein. Clearly, Graves was not injured "due to defects or alleged defects and material or workmanship of any item or product delivered" under the purchase order. Graves's injury was the result of the uninsulated high voltage lines, an object which LaFleur Electrical had not installed, provided, or worked upon.

DAMAGES
Because of the erroneous jury instruction on the issue of the determination of liability and our ensuing de novo review, Graves contends that we are not bound by the manifest error rule in the evaluation of his damage award.
To the contrary, Lou Ana and Hartford contend that we are bound by the manifest error rule since the jury's determination of damages was in no way tainted by any error which involved an instruction on the question of the employer's liability.
Lou Ana and Hartford rely on Schwamb v. Delta Air Lines, Inc., 516 So.2d 452 (La.App. 1st Cir.1987), writs denied, 520 So.2d 750 (La.1988). In Schwamb, our brethren of the First Circuit concluded that a jury's damage award should be assessed under the manifest error standard even though the appellate court conducted a de novo review of liability because of an erroneous jury instruction.
Graves relies on Marks v. Louisiana Farm Bur. Cas. Ins., 556 So.2d 949 (La. App. 3rd Cir.1990). In Marks, we conducted a de novo review of liability because of an erroneous jury interrogatory and assessed damages after independently reviewing the record without reference to the manifest error standard.
In researching this question, we have found no Louisiana Supreme Court case addressing the issue of the standard of appellate review specifically presented herein. Picou v. Ferrara, 483 So.2d 915 (La.1986), on remand 488 So.2d 1250 (La. App. 4th Cir.1986), writ denied, 494 So.2d 332 (La.1986), cited by Lou Ana and Hartford, addressed only questions of review as to varying aspects of liability and did not reach the effect of a partial de novo review on the issue of damages.
In Suhor v. Gusse, 388 So.2d 755, 758 (La.1980), on remand 403 So.2d 83 (La.App. 4th Cir.1981), writ denied, 414 So.2d 1217 (La.1982), the Supreme Court stated:
"An appellate court, when it believes that errors committed at trial influenced the jury verdict, must undertake an independent evaluation of the facts and adjudicate the controversy before it."
See also Mitchell v. Fire and Cas. Ins. Co., 540 So.2d 352 (La.App. 1st Cir.1989), writ denied, 541 So.2d 1390 (La.1989).
Based on the abusively low awards the jury made to Graves for physical pain and suffering ($90,000), disfigurement, disability and scarring ($10,000), and loss of earnings ($15,000), in light of the strong evidence presented on each of these elements of damages in the record, we cannot say that the erroneous consideration of LaFleur Electrical's liability did not affect the jury's factual assessment of damages. Accordingly, we choose to follow our analysis in Marks. Since we have an adequate record detailing Graves's damages, we will assess the damages without binding ourselves to the allotments made by the jury in the various categories of damages sought.
Graves, who was 29 years of age at the time of the accident, was shocked by an uninsulated high voltage wire which carried in excess of 7,600 volts of electricity. Since Graves was perched on top of the pipe rack, he either fell to the ground 23 feet below as a result of the electrical *165 charge or he was thrown to the ground by the charge. When he landed on the ground, Graves's helper, Mark Deshotel, described that Graves's pants and flesh were on fire and that the flames were 6 to 8 inches high. The record preponderates that Graves remained conscious and lay on the ground for approximately 45 minutes before an ambulance arrived.
Dr. Daniel Buller, a general surgeon, first evaluated Graves's medical condition in the emergency room of Opelousas General Hospital. He found that Graves suffered electrical burns as well as multiple orthopedic injuries.
Dr. Buller testified that Graves suffered electrical burns on both hands, on the buttocks, pelvis, thighs, genitalia, scrotum, and a massive blowout burn on the right upper thigh. Burn treatment consisted of debridement and surgical grafting. Graves underwent two types of debridement. In one procedure wet gauze was placed on his burns, let dry, and then peeled off with forceps to remove the dead skin. In the other method, Graves was placed in a whirlpool to loosen the dead skin before forceps were used to remove the dead skin tissue without gauze. Debridement was done approximately twice a day during Graves's one month hospitalization. Graves described the excruciating pain associated with debridement and testified that even though he received pain shots, he would clench a towel between his teeth to muffle the sounds of his screams. In addition, Graves underwent six or seven plastic surgeries in which skin was removed from donor sites on his left thigh and grafted to the burn areas.
Dr. Frazier Gaar, an orthopedic surgeon, treated Graves's multiple orthopedic injuries. Dr. Gaar testified that Graves sustained a dislocated left elbow, completely out of socket; a torn ligament in his left thumb; a broken and shattered right wrist; a broken left hip; and a fractured right rib. Surgery was required to address all of the orthopedic injuries except for the broken rib. Because of Graves's burns, surgery of the hip had to be postponed, and a pin was placed below Graves's left knee so that traction could be used until surgery was possible. Approximately one week after admission, Dr. Gaar surgically opened the broken left hip and inserted a metal screw to hold the broken bones in place; the screw was surgically removed better than one year later. Pins were also surgically inserted twice in Graves's wrist because the first surgery did not correctly repair the fracture.
The record shows that Graves underwent five surgeries under general anesthesia, twice daily debridements, and physical therapy during his one month hospitalization. Graves verbalized his fear of surgery under general anesthesia as well as the pain of physical therapy. From the time of his hospitalization until one month after his discharge from the hospital, Graves's arms were in casts, and he could only ambulate on crutches.
Graves's pain continued after his release from the hospital. In particular, he spoke about how the twice a day cleansing of his wounds, which continued for one month after his discharge, reactivated the pain he initially felt. Likewise, Graves testified about the severe muscles spasms he had because of his orthopedic injuries.
Graves testified that he underwent medical treatment for his orthopedic injuries for 17 months after the accident. As of the time of trial Graves stated that 4 out of 7 days are bad, and that he has recurring pain in his hip and wrist. Graves further explained that when he sits on hard surfaces the areas of his buttocks which were burned become sensitive.
In the assessment of damages for physical pain and suffering, the primary considerations are the severity and duration thereof. Based on the record evidence, we find that even though the outcome of the treatment of his burns and orthopedic injuries was extremely successful, the degree of physical pain and suffering endured by Graves as a result of the multiple injuries justifies an award of $500,000 for past and future physical and mental pain and suffering.
*166 The next item of damages requested is, an award for permanent scarring, disfigurement and physical impairment.
Dr. Buller testified that although the burns Graves received would not leave him functionally impaired, Graves would suffer residual scarring and the loss of pigmentation. In addition to the scarring being visible when wearing a bathing suit, Dr. Buller expected Graves to feel discomfort in the pelvic area during prolonged sitting. Similarly, Dr. Buller testified that Graves would encounter sensitivity in the hands because of the burns he experienced while holding onto the metal conduit.
Dr. Gaar assessed Graves with a 7 to 8% impairment of his whole body because of his orthopedic injuries. He testified that Graves's physical condition would permit him to perform only light duty or sedentary work.
On the basis of these assessments, we find that Graves is entitled to an award of $75,000 for the scarring, disfigurement and physical impairment he has suffered.
Graves next seeks an award of damages for loss of earnings and earning capacity. He contends that he was entitled to an award for the period of time during his medical treatment through the time it would have taken for vocational rehabilitation.
Dr. Gaar, the treating orthopedist, acknowledged that Graves was not permanently disabled and that he could return to lighter sedentary work. Dr. Gaar released Graves in May 1988, eighteen months after the accident, and thought that he could have returned to restricted work as of that time.
Conflicting testimony was presented on the question of whether Graves was psychologically prepared for employment or vocational rehabilitation after his release from Dr. Gaar. Dr. Lynn Aurich, Graves's treating psychologist, opined that as of the date of trial Graves was suffering from post traumatic stress disorder and was unprepared for vocational rehabilitation. To the contrary, Dr. Lawrence Wade, a psychiatrist called by Lou Ana, opined that Graves could have returned to work or undergone vocational rehabilitation as of the time of trial and could have returned for some time prior thereto.
Two vocational rehabilitation counselors also testified, Robert Gisclair for Graves and Dr. John Grimes for Lou Ana.
Gisclair testified that 73% of the jobs which were available to Graves prior to the accident are no longer available because of his disabilities. Gisclair recommended that Graves undergo vocational training in an area such as drafting; such a curriculum could be completed within 24 months. As a draftsman, Gisclair opined that Graves would initially earn $5.50 per hour and that within 3 to 5 years his income would exceed that of an electrician.
Dr. Grimes testified that at the time of trial Graves had various jobs available to him which would pay him between minimum wage and $5.50 per hour. However, his recommendation was that because of Graves's many transferable skills that the better approach would be for Graves to undergo vocational rehabilitation. In this manner he thought that Graves could earn more money than he was earning as an electrician. Dr. Grimes further opined that Graves could have begun his vocational rehabilitation since May 1988, the date Dr. Gaar released Graves from his medical care.
The only other expert to testify regarding Graves's loss of wages was Dr. John Chisholm, an economist. Dr. Chisholm calculated that based on Graves's annual salary of $14,341.02, Graves's loss of income as of the date of trial amount to $44,493.94. Although Dr. Chisholm projected other amounts for future loss of wages, Graves's has not urged us to consider future loss of wages on appeal.
We find that on the basis of the medical and expert testimony provided, Graves more probably than not could have begun vocational rehabilitation when he was released by Dr. Gaar. In reaching this conclusion, we find no merit in Lou Ana and Hartford's contention that Graves could return to work one year after the accident. Based on an extrapolation of his annual *167 earnings and the 24 month period of vocational rehabilitation, we find that Graves was entitled to an award of $48,079.21 for loss of income. This sum includes the period of time beyond the trial on the merits for vocational rehabilitation, based on Dr. Chisholm's calculations.
The amount of Graves's medical expenses was not contested at trial. Accordingly, we find that Graves is entitled to $61,134.97 for the medical expenses incurred as of the date of trial.
Lastly, Graves seeks an award for exemplary damages.
At the time of trial, LSA-C.C. Art. 2315.3 provided:
"In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances."
In Cates v. Beauregard Electric Cooperative, Inc., 316 So.2d 907, 916 (La.App. 3rd Cir.1975), writ granted, 321 So.2d 362 (La. 1975), affirmed, 328 So.2d 367 (La. 1976); cert. denied, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976), we stated:
"The terms `willful', `wanton', and `reckless' have been applied to that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence. These terms apply to conduct which is still merely negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if harm was intended. The usual meaning assigned to do the terms is that the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow."
Assuming arguendo that at the time of trial electricity constituted a hazardous substance within the intendment of LSA-C.C. Art. 2315.3, we find no evidence in the record to show that Lou Ana's actions fell within the parameters of conduct explained in Cates, supra. Accordingly, we find no merit in Graves's request for exemplary damages.

AETNA'S INTERVENTION
Having found that Graves was entitled to recover from Lou Ana and Hartford, we likewise find that Aetna should be reimbursed for medical expenses and worker's compensation benefits paid, according to the percentage of recovery granted Graves. Based on the stipulations in the record, we find that Aetna's reimbursement from Graves should be $65,528.51.
Aetna also contended on appeal that it should receive an award for the attorney's fees it has incurred to protect its interest as the worker's compensation intervenor. We have carefully examined the record, noting with particularity the degree of participation of Aetna's counsel in the trial effort. Based on our review, we find no justification to award Aetna an attorney's fee on the amount recovered from Lou Ana and Hartford.
However, pursuant to Moody v. Arabie, 498 So.2d 1081 (La.1986), and its progeny, Aetna owes Graves reimbursement for a proportional share of the trial costs expended and the attorney's fee for the prosecution of Graves's claim for damages.
Utilizing the Moody formula, we calculate Aetna's share of total unreimbursed litigation expenses as the ratio between the amount of Aetna's recovery and the total amount of recovery Graves receives from third parties. Based on that ratio ($65,528.51 divided by $410,528.51) Aetna's share of litigation expenses is 15.96%. It was not disputed in the trial court that Graves's expenses of litigation totaled $35,453.76. Accordingly, we find that Graves is entitled to reimbursement from Aetna in *168 the amount of $5,658.42 for litigation expense.
The next item before us is the calculation of Aetna's liability for a proportional share of Graves's attorney's fees. The jurisprudence has stated that in determining this figure it is appropriate for the court to consider the contingency fee contract entered into between the claimant and his attorney. In the present case, we have combed the record for a copy of the contingency fee contract referred to in brief by Graves and are unable to find that it was entered into evidence.
In determining and fixing the attorney's fees, the court must adhere to the Rules of Professional Conduct which prohibit a lawyer from collecting a fee that is in excess of a reasonable fee, and which set forth factors to be considered in determining the reasonableness of a fee. Title 37 Ch. 4 App., Art., 16, Rule 1.5. These rules and standards permit a court to consider an attorney-client contract among other factors but prohibit it from being bound by such an agreement in determining reasonable attorney's fees. Therefore, we find it necessary to remand the case to the trial court to conduct a hearing on the issue of reasonable attorney's fees and to make a determination based on the evidence adduced of what Aetna owes as its share of the reasonable attorney's fees.
For the foregoing reasons, IT IS ORDERED, ADJUDGED AND DECREED THAT the judgment of the trial court is reversed and set aside, and that there be judgment herein in favor of Jerry Graves and against Lou Ana Foods, Inc. and The Hartford Accident and Indemnity Company in the amount of $410,528.51 (60% of the amount of the total damage award), together with legal interest from the date of judicial demand until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that third-party defendant, Verbis LaFleur Electrical Services be and is hereby dismissed with prejudice from the third-party demand filed by Lou Ana Foods, Inc. and The Hartford Accident and Indemnity Company.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all claims by Jerry Graves for exemplary damages from Lou Ana Foods, Inc. and The Hartford Accident and Indemnity Company are dismissed with prejudice.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the intervention of Aetna Casualty and Surety Company be granted. Accordingly, Aetna shall be reimbursed from the award for plaintiff's loss of earnings and earning capacity and medical expenses all sums paid by Aetna Casualty and Surety Company up until the time the judgment is paid and that Aetna Casualty and Surety shall receive a credit against future compensation owed by Aetna Casualty and Surety Company to the plaintiff in an amount equal to any monies actually paid to the plaintiff for loss of earnings and earning capacity and medical expenses less any amounts paid to intervenor for reimbursement made for past payments, not to exceed the sum of $65,528.51 with interest and costs recovered by Jerry Graves.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Aetna Casualty and Surety Company is hereby ordered to pay Jerry Graves 15.96% of the expenses of litigation, totaling $5,658.42 (15.96% × $35,453.76 = $5,658.42). This matter is remanded for a determination of the amount of reimbursement Aetna Casualty owes Graves for its proportionate share of attorney's fees.
Costs of this appeal and the trial court are assessed 40% to Jerry Graves and Aetna Casualty and Surety Company and 60% to Lou Ana Foods, Inc. and The Hartford Casualty and Indemnity Company. Costs of the hearing on attorney's fees shall await final disposition of this issue.
DECISION RENDERED AND REMANDED IN PART.

ON REHEARING
PER CURIAM.
Jerry Graves has applied for a rehearing to correct our calculation of the amount of reimbursement Aetna is entitled to receive *169 and to amend the judgment to reflect Aetna's lowered liability for litigation expenses.
We have carefully checked the record, and it shows that Graves and Aetna stipulated that Graves received $30,625.50 in worker's compensation benefits and $61,134.97 in medical expenses. Based on the 60% recovery granted Graves, Aetna should receive reimbursement of $55,056.28, rather than the $65,528.61 reflected in our original opinion.
Likewise, since Aetna's reimbursement is lessened, Aetna's liability for the plaintiff's expenses of litigation should be proportionally lowered. Based on our amended computations, we have recalculated Aetna's ratio of liability and have determined that it is responsible for 13.41% of the expenses of litigation incurred by Graves. Utilizing this percentage, Aetna's liability for the expenses of litigation should be $4,754.35.
In making these determinations, we have carefully studied Aetna's assertion that we should not amend our judgment because in actuality it has paid more to or on behalf of Graves than the amounts stipulated at trial. It is axiomatic that we are bound by the evidence and stipulations introduced at trial. Accordingly, we cannot consider Aetna's assertions made in response to Graves's application for rehearing.
Accordingly, we granted the application for rehearing for the limited purpose of correcting and amending the fourth and fifth paragraphs of our July 2, 1992 decree.
In all other respects, our original decree is affirmed. Paragraphs four and five are now recast to correctly read as follows: IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the intervention of Aetna Casualty and Surety Company be granted. Accordingly, Aetna shall be reimbursed from the award for plaintiff's loss of earnings and earning capacity and medical expenses all sums paid by Aetna Casualty and Surety Company up until the time the judgment is paid, and that Aetna Casualty and Surety shall receive a credit against future compensation owed by Aetna Casualty and Surety Company to the plaintiff in an amount equal to any monies actually paid to the plaintiff for loss of earnings and earning capacity and medical expenses less any amounts paid to intervenor for reimbursement made for past payments, not to exceed the sum of $55,056.28 with interest and costs recovered by Jerry Graves.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Aetna Casualty and Surety Company is hereby ordered to pay Jerry Graves 13.41% of the expenses of litigation, totaling $4,754.35 (13.41% × $35,453.76 = $4,754.35). This matter is remanded for a determination of the amount of reimbursement Aetna Casualty owes Graves for its proportionate share of attorney's fees.
NOTES
[*] Judge Bernard N. Marcantel participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.